UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Newport News Division)

| | | |
|---|---|---|
| BUILDERS MUTUAL INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 4:10cv00068-MSD-FBS |
| | ) | |
| PARALLEL DESIGN & DEVELOPMENT LLC, and | ) | formerly: |
| RICKY L. EDMONDS, | ) | Case No. 3:09CV00800 |
| | ) | (Richmond Division) |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF BUILDERS
MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this case, Builders Mutual Insurance Company ("Builders Mutual") seeks a declaration

that it owes no duty to defend (and, therefore, no duty to indemnify) its insured, Parallel Design

& Development LLC ("Parallel") with regard to a lawsuit brought by Ricky L. Edmonds

("Edmonds") seeking damages due to the presence of Chinese Drywall in his home.

Builders Mutual's Policy issued to Parallel and in effect at the time Edmonds took

occupancy of his home contains a Total Pollution Exclusion, added by way of an Endorsement to

the Policy, excluding from coverage any loss, cost or expense arising out of any "Request,

demand, order or statutory or regulatory requirement that any insured or others test for, monitor,

clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the

effects of 'pollutants.'" The Policy's definition of "pollutants" is contained in Exclusion (f); but

the Total Pollution Exclusion Endorsement replaced Exclusion (f), leaving the term undefined.

In all subsequent policies issued to Parallel, the definition of "pollutants" is found in the

definitions section and is not removed by virtue of the Total Pollution Exclusion Endorsement.

In identical language to that contained in former Exclusion (f), it provides that "Pollutants means

any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.   Waste includes materials to be recycled, reconditioned or reclaimed."

The Edmonds Complaint alleges that Chinese Drywall used in the Plaintiff's home "is inherently defective because it emits **various sulfide gases and/or other toxic chemicals** through 'off-gassing' that creates noxious odors, and causes damage and corrosion (the 'Defect') to the structural, mechanical and plumbing systems of the Plaintiff's home such as the framing, heating, air-conditioning and ventilation ('HVAC') units, refrigeration coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring, as well as personal and Other Property such as microwaves, utensils, electronic appliances, jewelry, and other household and personal property items ('Other Property')."   Edmonds Complaint at ¶ 11.   The Complaint makes crystal clear that the sulfur compounds in question are pollutants, under any definition of the term: "**The compounds emitted by the drywall at issue are also capable of, among other things, harming the health of individuals subjected to prolonged exposure.**  These chemical compounds cause and have caused dangerous health consequences, including, among other things, allergic reactions, respiratory afflictions, sinus and bronchial problems requiring medical attention, including headaches suffered by the Plaintiffs."   Complaint at ¶ 12.   As if that were not enough, the Complaint adds, at ¶ 58, that "some of the compounds being emitted from Defendants' defective drywall are very hazardous, some latently **affecting the central nervous system and basic oxygenation on a cellular level**."   Finally, at ¶ 59, the Complaint states, "Plaintiff has been exposed to **airborne sulfur-based chemicals** in quantities sufficient to harm them, and they have been harmed."

There can be no serious argument that Edmonds' allegations do not clearly fall within the definition of "pollutants". In papers filed previously herein, Edmonds has argued that the term "pollutants" in the 2006-07 Policy is undefined and therefore ambiguous.

However, the absence of a definition does not render a policy term ambiguous – instead, the term is simply given its usual and customary meaning. As detailed below, "toxic" "sulfur gases" and other "toxic chemicals" that are "air-borne", cause egregious bodily injuries, and damage residences to the point that they are unlivable are "pollutants" under any definition. Because Edmonds' entire Complaint rests upon such allegations, and because Virginia's "eight corners" rule provides that the duty to defend is to be determined solely by reference to the complaint and the policy, no possibility of coverage exists under the Policy; and Builders Mutual is entitled to summary judgment declaring that it owes Parallel no duty to defend

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.      Builders Mutual issued Commercial Package Policy, Policy No. CP 0016334 03, to Parallel Design & Development LLC ("Parallel") for the policy period from June 1, 2006 to June 1, 2007 (the "Policy").  Complaint Exhibit 1; Affidavit of Carl Warbington ("Warbington Aff.") at ¶ 2.[1]

2.      On or about September 3, 2009, Ricky L. Edmonds ("Edmonds") filed a Complaint against Parallel and others in the Circuit Court for the City of Norfolk, Virginia ("Edmonds Complaint").  Complaint Exhibit 2.

3.      Pending a declaration by this Court in this declaratory judgment action, Builders Mutual is providing Parallel with a defense of the claims asserted in Edmonds' Complaint, pursuant to a reservation of rights.

---

[1]      Warbington Affidavit is attached as Exhibit A.

*Allegations of the Edmonds Complaint*

4.     The Edmonds Complaint alleges that Chinese Drywall used in the Plaintiff's home "is inherently defective because it emits **various sulfide gases and/or other toxic chemicals** through 'off-gassing' that creates noxious odors, and causes damage and corrosion (the 'Defect') to the structural, mechanical and plumbing systems of the Plaintiff's home such as the framing, heating, air-conditioning and ventilation ('HVAC') units, refrigeration coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring, as well as personal and Other Property such as microwaves, utensils, electronic appliances, jewelry, and other household and personal property items ('Other Property')." Edmonds Complaint at ¶ 11.

5.     The Edmonds Complaint alleges that the sulfur "**compounds emitted by the drywall at issue are also capable of, among other things, harming the health of individuals subjected to prolonged exposure**.   These chemical compounds cause and have caused dangerous health consequences, including, among other things, allergic reactions, respiratory afflictions, sinus and bronchial problems requiring medical attention, including headaches suffered by the Plaintiffs."  Complaint at ¶ 12.

6.     The Edmonds Complaint alleges, at ¶ 58, that "some of the compounds being emitted from Defendants' defective drywall are very hazardous, some latently **affecting the central nervous system and basic oxygenation on a cellular level**."

7.     The Edmonds Complaint alleges, at ¶ 59, that "Plaintiff has been exposed to **airborne sulfur-based chemicals** in quantities sufficient to harm them, and they have been harmed."

*Relevant Policy Provisions*

8.      At Section I, Coverage A, (1)(a), the Commercial General Liability Coverage Form of the Policy provides, in relevant part, for payment of "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."

9.      At Section I, Coverage A, (1)(b), the Commercial General Liability Coverage Form provides, in relevant part, that "[t]his insurance applies to 'bodily injury' and 'property damage' only if:

> "(1)   The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory;' and

> "(2)   The 'bodily injury' or 'property damage' occurs during the policy period."

10.     The Policy contains a TOTAL POLLUTION EXCLUSION ENDORSEMENT (the "Total Pollution Exclusion"), endorsement CG 21 49 09 99 ("Endorsement 21 49"). The Total Pollution Exclusion excludes from coverage "'bodily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time."

11.     Endorsement 21 49 replaces former Exclusion (f) of the Commercial General Liability Form. Exclusion (f) contains the following definition of "pollutant": "Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.   Waste includes materials to be recycled, reconditioned or reclaimed."

12.     The Total Pollution Exclusion in the 2006-2007 Policy specifically excludes from coverage any loss, cost or expense arising out of any "Request, demand, order or statutory or

regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of 'pollutants.'"

13.     Pursuant to Endorsement BCG 22 94 11 03 of the Builders Mutual 2006-2007 Policy, coverage is excluded for "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard". "Your work" is defined under the policy to mean (1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations, and includes warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work'; and the providing of or failure to provide warnings or instructions. "Product-completed operations hazard" is defined as including all "bodily injury" and "property damage" "occurring away from premises you own or rent and arising out of 'your product' or 'your work'" except "products that are still in your physical possession" or "work that has not yet been completed or abandoned."

### *Subsequent Policies*

14.     The Certificate of Occupancy for Edmonds' property at 801 Holly Street in Richmond was issued on July 25, 2006, within the policy period of Policy No. CP 0016334 03. Warbington Aff. ¶ 3.

15.     Between the end of the Policy Period of Policy No. CP 0016334 03, and the date of notice to Builders Mutual of claims against Parallel on or about May 20, 2009, Builders Mutual issued renewal policies to Parallel for coverage periods June 1, 2007 to June 1, 2008, and June 1, 2008 to June 1, 2009. True copies of those policies are attached to the Warbington Affidavit. Each of those policies contains the Total Pollution Exclusion Endorsement CG 21 49 09 99 and the "Your Work" exclusion at Endorsement BCG 22 94 11 03.   Warbington Aff. ¶ 4.

Each of those policies contains, in its Definitions section, the same definition of "pollutant" formerly found in as Exclusion (f).

## STANDARD ON SUMMARY JUDGMENT

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence but rather to determine if there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the non-moving party. See Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 119 (4th Cir.1991).

Summary judgment is appropriate in insurance "duty to defend" cases, given that the court is typically limited to consideration of the policy and the allegations of the underlying complaint. This is the "Eight Corners Rule" followed by Virginia and applied by the Fourth Circuit. See Minnesota Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP, 355 Fed.Appx. 698, (4th Cir. 2009) (trial court dismissed declaratory judgment action "duty to defend" case without prejudice under the finding that it would be necessary to find facts being litigated in a collateral action; Fourth Circuit reversed because the trial court cannot look beyond the allegations of the suit and the language of the policy at issue).

## STANDARD FOR DETERMINATION OF DUTY TO DEFEND

"Under Virginia law, the scope of the duty to defend is analyzed under the "eight corners" test--in other words, the question is answered by examining the four corners of the

complaint and the four corners of the insurance policy.  If the complaint alleges facts, some of which, if proven, would fall within the scope of insurance coverage, then the insurer is obligated to defend the insured.  On the other hand, if the complaint's allegations fall outside the scope of coverage, then there is neither a duty to defend nor a duty to indemnify."  Zurich Am. Ins. Co. v. Public Storage, 697 F. Supp. 2d 640, 645-646 (E.D. Va. 2010) (Thus, determining whether an insured has duties to defend and indemnify "merely requires examining the complaint in the state court action and deciding whether any of those factual allegations, if sufficiently proven, would fall within the scope of the insurance policy, or whether, instead, they fall within one of the asserted policy exclusions").

## ARGUMENT

### THE APPLICABLE POLICY IS THAT WHICH WAS IN EFFECT WHEN THE CERTIFICATE OF OCCUPANCYWAS ISSUED FOR THE HOME, WHERE THE ONLY DAMAGES SOUGHT BY EDMONDS WERE ALLEGED TO HAVE OCCURRED AFTER PURCHASE

Policy No. CP 0016334 03, issued to Parallel Design & Development LLC ("Parallel") for the policy period from June 1, 2006 to June 1, 2007 (the "Policy"), was the policy in force as of the date of issuance of the Certificate of Occupancy for the Edmonds home on July 25, 2006. Warbington Aff. ¶ 3; Complaint ¶ 15; Answer of Parallel ¶ 15.  The Edmonds' claimed damages arose, if at all, after that time.  The Policy provides, at Section I, Coverage A, (1)(b) of the Commercial General Liability Coverage Form therein, that "[t]his insurance applies to 'bodily injury' and 'property damage' only if . . . (2) The 'bodily injury' or 'property damage' occurs during the policy period."  Thus, the 2006-07 Policy is the earliest one that could apply to the Edmonds claim.  See Boss Mgmt. Servs. v. Acceptance Ins. Co., 2007 U.S. Dist. LEXIS 69666, 38-39 (S.D. Tex. Sept. 19, 2007) (The certificates of occupancy evidence the dates on which the buildings were completed for purposes of determining applicable policies).

Whether subsequent policies may be triggered by virtue of a "continuous trigger" rule (which has never been adopted by the Supreme Court of Virginia) is irrelevant to the present motion because each subsequent policy in effect until the time the claim was reported contains the identical policy provisions relied on herein, with the exception that in each such subsequent policy, the term "pollutant" is defined, and such definition is not removed by virtue of the Total Pollution Exclusion endorsement.

## NO DUTY TO DEFEND EXISTS AS THE POLICY'S TOTAL POLLUTION EXCLUSION EXCLUDES COVERAGE FOR THE EDMONDS CLAIMS

### *Under Virginia Law, Ambiguity Requires a Finding That a Term is Subject to Two Equally Fair and Reasonable Interpretations*

Certain well established legal principles apply to the determination of whether a term in an insurance policy is ambiguous.

In Virginia "an insurance policy is a contract to be construed in accordance with [**11] the principles applicable to all contracts." Seabulk Offshore, Ltd., 377 F.3d at 419 (citing Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co., 240 Va. 457, 397 S.E. 2d 876, 877, 7 Va. Law Rep. 895 (Va. 1990)). As with other contracts, when interpreting a policy courts must not strain to find ambiguities, or examine certain specific words or provisions in a vacuum, apart from the policy as a whole.  Resource Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 636 (4th Cir. 2005) (citations omitted).

While ambiguity in a policy is to be resolved against the insurer and in favor of coverage, this doctrine is not without limits.  The construction adopted must be "reasonable" and "absurd results are to be avoided." Transit Cas. Co. v. Hartman's Inc., 218 Va. 703, 708, 239 S.E.2d 894 (1978).  Thus, under Virginia law, a finding of ambiguity will result in the adoption of the interpretation "which allows a greater indemnity" only "where two interpretations **equally fair**

may be made." Ayres v. Harleysville Mut. Cas. Co., 172 Va. 383, 389, 2 S.E.2d 303 (1939).
See also Downtown Norfolk Entm't, Inc. v. Penn-American Ins. Co., 660 F. Supp. 2d 669, 674
(E.D.Va. 2008) ("an insurance policy is ambiguous only if it is susceptible of two reasonable
interpretations"), citing Resource Bank v. Progressive Cas. Ins. Co., 503 F.Supp.2d 789, 796
(E.D. Va. 2007) (internal quotation omitted).

Given the extent to which the Edmonds Complaint alleges severe property damage and
bodily injury solely attributable to the emission of toxic sulfur compounds from drywall, the only
alternative interpretations of the Policy's Total Pollution Exclusion. i.e., that it applies solely to
toxic gases emitted into the external environment, or that it is limited to the most severe of
environmental catastrophes, requires the Court to read into the Exclusion language nowhere
found therein – something that Virginia courts interpreting the exclusion have repeatedly refused
to do.

### The Total Pollution Exclusion Endorsement Removed the Definition of "Pollutant" from the 2006-07 Policy Only.  In All Subsequent Policies, the Definition is Found in the Definitions Section of the Policy

The Total Pollution Exclusion Endorsement to the 2006-07 Policy replaced that Policy's
Exclusion (f).  The only place in the 2006-07 Policy where the definition of "pollutant" appears
is at the end of Exclusion (f).  On all subsequent policies issued to Parallel by Builders Mutual,
the definition of "pollutant" appears in the definitions section.  Thus, as to the 2006-07 Policy
only, the definition of "pollutant" appears to have been withdrawn, rendering the term
"pollutant", as used in the Total Pollution Exclusion, an undefined term.

### The Mere Fact That the Word "Pollutant" is Undefined in the 2006-07 Policy Does Not Render it Ambiguous

Omitting the definition of a word that has a common usage does not create an ambiguity
within the policy.  Instead, "under Virginia law, when words are undefined in an insurance

policy, 'as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction.'" CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 158 (4th Cir. 2009), quoting Salzi v. Va. Farm Bureau Mut. Ins. Co., 263 Va. 52, 556 S.E.2d 758, 760 (2002) (internal quotation omitted).  See also Dominion Res. Servs. V. 5K Logistics, Inc., 2010 U.S. Dist. LEXIS 20793, ** 14-15 (E.D. Va. Mar. 8, 2010) ("The mere fact that the phrase "scope of . . . usual business" is undefined in the contract does not make it susceptible to multiple meanings or ambiguous.").

### Undefined Terms are Interpreted by Considering Their Meaning in the Context of the Entire Policy

"When courts determine the plain and ordinary meaning of an undefined term within a policy, they will routinely look to dictionary definitions of the term." Schwartz & Schwartz v. Certain Underwriters at Lloyd's, 677 F. Supp. 2d 890, 905 (W.D. Va. 2009) (citing Spence-Parker v. Md. Ins. Group, 937 F.Supp. 551, 556 (E.D. Va. 1996)).  **And yet the ordinary and accepted meaning of an undefined term cannot be divined in isolation, but instead is informed by the surrounding context of the insurance policy.**" Schwartz & Schwartz, supra, 677 F. Supp. 2d at 905 (emphasis added), citing CACI Int'l, Inc., supra, 566 F.3d at 156 (the court "can further interpret" an undefined term "by considering its meaning in the context of the policies as a whole"); Atlas Underwriters, Ltd. v. Meredith-Burda, Inc., 231 Va. 255, 258, 343 S.E.2d 65, 67 (1986) (even though certain terms are not defined in the policy, "we hold that in the context of this insurance contract these crucial words are clear and unambiguous").

Thus, notwithstanding that a "term is ambiguous if, to a reasonably prudent person, the term is susceptible of more than one meaning", Solers, Inc. v. Hartford Cas. Ins. Co., 145 F. Supp. 2d 785, 793 (E.D. Va. 2002), a "term is not ambiguous simply because parties disagree about the meaning." 145 F. Supp. 2d at 792.  Instead, two different meanings must each be

reasonable in the context of the entire policy.  Resource Bankshares Corp. v. St. Paul Mercury

Ins. Co., 407 F.3d 631, 636 (4th Cir. Va. 2005) (whether a policy term is ambiguous depends on

whether, **in the "context of the policy as a whole, it is capable of more than one reasonable**

**meaning"**) (emphasis added), citing Caldwell v. Transp. Ins. Co., 234 Va. 639, 364 S.E. 2d 1, 3

(1988).  "Merely being able to conjure up a remotely possible second interpretation is not

sufficient to invoke the ambiguity rule (and thus resolve the ambiguity against the insurer).  If it

were, no contract would be safe from modification by construction."  US Fire Ins. Co.  v. Ace

Baking Co., 164 Wis.2d  499, 503, 476 N.W.2d 280 (Wis. Ct. App. 1991) (citations omitted).

### *In Interpreting an Undefined Term in the Context of the Entire Policy, the Term Will Not Be Treated as Meaningless if Any Meaning, Reasonably Consistent with the Policy as a Whole, Can Be Given*

"No word or clause in the contract will be treated as meaningless if a reasonable meaning

can be given to it, and there is a presumption that the parties have not used words needlessly."

City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 628 S.E.2d 539, 542

(2006).  Thus, "'[s]ome force and effect must be given to [particular provisions], as it is a duty of

the court to construe the contract as a whole, and in the performance of this duty it will not treat

as meaningless any word thereof, if any meaning, reasonably consistent with other parts of the

contract, can be given.'"  Greenbaum v. Travelers Ins. Co., 705 F.Supp. 1138, 1141 (E.D.Va.

1989) (quoting First American Title Insurance Co., supra, 227 Va. at 386, 315 S.E.2d at 846).[2]

Applying the above rules of Virginia law for interpretation of undefined policy terms, the

term "pollutant" clearly and unambiguously encompasses the allegations of the Edmonds

---

[2]    See Restatement (Second) of Contracts § 203(a) (1979) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms [of an agreement] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").

complaint, i.e., the emission of hazardous sulfur compounds from Chinese Drywall into the air, rendering the Edmonds home unlivable and causing central nervous system damage.

### The Term "Pollutant" Has an Ordinary and Customary Meaning Which Unambiguously Excludes Coverage for Pollution on the Level of Severity Described in the Edmonds Complaint

The term "pollutant" has an ordinary and customary meaning "which is not broad enough to encompass a spilled bottle of Drano or errant paint, but would include leaking heating oil storage tanks or fuel lines and the resulting unrecoverable spilled oil." West Am. Ins. Co. v. Johns Bros., 435 F. Supp. 2d 511 (E.D. Va. 2006) ("injuries from everyday activities gone slightly, but not surprisingly, awry, such as spilling a bottle of Drano or paint damage to vehicles caused by the errant spraying of a bridge, are not considered pollution") (citation and internal punctuation omitted).

The chemicals allegedly being emitted from Chinese Drywall in the Edmonds home do not come about because of "everyday activities gone slightly, but not surprisingly, awry". They are described in the complaint as toxic sulfur compounds causing the equivalent of an indoors Love Canal – the Edmonds home is unlivable, its residents at risk for permanent, serious health problems.

Consistent with the Court's holding in West Am. Ins. Co. v. Johns Bros., while the term "pollutant" may be ambiguous when applied to spilled Drano, it can hardly be found ambiguous when applied to the Edmonds allegations – instead, the Policy clearly intended to eliminate such allegations from coverage, and to read the Policy otherwise would be to read the exclusion out of the Policy. This is because the interpretation of "pollutant" must be done not merely in the context of the policy as a whole, but also in the context of the particular facts to which the term is being applied. Again, this is consistent with Virginia law. See Solers, Inc., supra, 145 F.

Supp. 2d at 792 ("Different courts have examined the meaning of "advertising" in varying contexts; the differences in context have led to differences in application. This does not mean that the word itself does not carry a plain and ordinary meaning."). See also City of Delray Beach v. Agricultural Ins. Co., 85 F.3d 1527, 1533 (11th Cir. Fla. 1996) ("the issue is not whether this [pollution exclusion] is an absolute exclusion, but whether it is clear and unambiguous that the exclusionary clauses herein intended to eliminate coverage for the activities alleged in the underlying action"); Coregis Ins. Co. v. American Health Foundation, Inc., 241 F.3d 123, 128 (2nd Cir. 2001) ("Nor is a finding of ambiguity appropriate, even assuming that a broad term might be ambiguous with respect to its application to a hypothetical set of facts, where, as here, the plain meaning of the phrase unambiguously includes the actual situation for which coverage is sought."); Continental Casualty Co. v. Rapid-American Corp., 80 N.Y.2d 640, 593 N.Y.S.2d 966, 972, 609 N.E.2d 506, 512 (1993) (pollution exclusion "[c]lauses can, of course, be ambiguous in one context and not another[.]").

As the Court in American W. Home Ins. Co. v. Utopia Acquisition L.P., 2009 U.S. Dist. LEXIS 23219, 6-7 (W.D. Mo. Mar. 24, 2009) wrote:

> Utopia's claim that the pollution exclusion is ambiguous lacks merit. Utopia relies on Hocker Oil Co., Inc. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d 510, 514 (Mo. Ct. App. 1999). That decision, however, rested on the unique facts of that particular case; particularly, the oddity of having a policy issued to a gas station exclude coverage for spilled gasoline on the basis that gasoline was a pollutant. Under Missouri law, the term "pollutant" is not limited to traditional environmental pollutants or situations, and the pollution exclusion is not limited to so-called "environmental pollution." Heringer v. American Fam. Mut. Ins. Co., 140 S.W.3d 100, 105-06 (Mo. Ct. App. 2004); Cincinnati Ins. Co. v. German St. Vincent Orphan Ass'n., Inc., 54 S.W.3d 661, 666 (Mo. Ct. App. 2001). **Even if there is ambiguity as to the outer limits of the term "pollutant," there can be little doubt that the exclusion of coverage for bodily injury caused by "irritants" and "contaminants" applies to Nash's claim of bodily injury caused by "airborne contaminants and/or irritants."**

2009 U.S. Dist. LEXIS 23219, ** 6-7 (emphasis added).  See also Gerdes v. Am. Family Mut.
Ins. Co., 2010 U.S. Dist. LEXIS 50179 (D. Kan. May 20, 2010) ("The term pollutant clearly
includes mercury, which is listed as a hazardous substance by the Environmental Protection
Agency.  Finding no ambiguity, the Court will give the definition of pollutant its plain and
ordinary meaning and there is no need for judicial interpretation. Rather, the Court must enforce
the definition of pollutant according to its terms, which demonstrate that mercury is a pollutant
under the Policy.").

### Courts Interpreting Policies in Which "Pollutant" was Undefined Have Found Pollution Exclusions to Unambiguously Exclude Indoor Pollution from Coverage

While the pollution exclusions addressed in the foregoing cases including a policy
definition of "pollutant", courts interpreting policies in which the term "pollutant" was undefined
have had no difficulty rejecting ambiguity arguments.

In Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co., Inc., 112 F.3d
184 (5th Cir. 1997), the Fifth Circuit also found a pollution exclusion clause operated to bar a
personal injury claim.  The plaintiff in the underlying state court suit alleged he was injured
while welding pipe at a chemical plant.  The plaintiff was standing under a tent to protect the
pipe and himself from the rain.  When the hot pipe made contact with chemicals, a cloud of
phenol gas was created and inhaled.  The Plaintiff brought suit against C.A. Turner.  The
insurance carrier denied it had a duty to defend citing to a pollution exclusion clause in its
insurance policy.  The terms "pollution" and "contamination" were not defined; and C.A. Turner
therefore contended the terms must be limited to their ordinary meaning which, according to it,
meant only widespread releases of hazardous substances into the environment.  The Fifth Circuit

15

disagreed, holding that coverage for damage resulting from the release of phenol gas was excluded.

> The clause clearly excludes "[l]iability for any bodily and/or personal injury . . . directly or indirectly caused by or arising out of seepage into or onto and/or pollution and/or contamination of air, land, water and/or any other property and/or any person irrespective of the cause of the seepage and/or pollution and/or contamination, and whenever occurring." The clause does not limit its application to only those discharges causing environmental harm; in contrast, it speaks broadly of "[l]iability for any bodily or personal injury." This language is not ambiguous; a plain reading of the clause dictates the conclusion that all damage caused by pollution, contamination, or seepage is excluded from coverage. . . Here, [Plaintiff's] injuries stemmed from the discharge of phenol gas that contaminated the air inside the tent enclosing the scaffolding; the release of the toxic chemical allegedly rendered him unable to breathe. Thus, the phenol gas emission constituted bodily-injuring pollution or contamination and coverage is precluded under the pollution exclusion clause.

Id. at 188.

Those Courts addressing policies in which the term "pollutant" was undefined have noted, just as the Court did in West Am. Ins. Co. v. Johns Bros., that the term "pollutant" must be read in the context of the facts to which it is being applied. In U.S. Fire Ins. Co. v. Ace Baking Co., 164 Wis.2d 499, 504-05, 476 N.W.2d 280, 283 (Wis. Ct. App. 1991), the pollution exclusion clause barred recovery for losses "caused by or resulting from … release, discharge or dispersal of 'pollutants.'" Id. at 502, 476 N.W.2d at 281. However, the policy did not define the term "pollutant". Id. at 502, 476 N.W.2d at 281-82. Thus, the decision in Ace Baking focused on the meaning to be given to that term.[3]

---

[3]      A common understanding of the term "pollutant" would include the notion that the term is synonymous with "contaminant". See United States v. White, 270 F.3d 356, 368 (6th Cir. 2001) ("The government also notes that the plain meaning of the terms "contaminate" and "pollute" are, for the most part, synonymous . . . . Webster's Dictionary defines 'contaminate' as 'to soil, stain, or infect by contact or association,' and lists as a 'sometimes interchangeable' synonym the term 'pollute.' Webster's New Collegiate Dictionary 245 (1975). 'Pollute' is defined as 'to make physically impure or unclean . . . to contaminate (an environment).' Id. at 891.").

The trial court in <u>Ace Baking</u> had concluded that the term "pollutant" should be given a narrow meaning: "The ordinary person would interpret pollutant as something that would adversely affect the environment or a person's health."  Id. at 502, 476 N.W.2d at 282.  Under this definition, the trial court concluded that linalool was not such a pollutant but could and apparently did affect a product's taste or smell.  See id.  The court of appeals disagreed.  The court held that if the substance which contaminated the ice cream cones was "foreign" to the cones, the substance qualified as a pollutant.  Id. at 505, 476 N.W.2d at 283.  The court noted: **it is a rare substance indeed that is always a pollutant; the most noxious of materials have their appropriate and non-polluting uses**. ... Here, although linalool is a valued ingredient for some uses, it fouled Ace Baking's products.  Accordingly, it was a "pollutant" in relation to those products, and coverage for the resulting damages is excluded from the United States Fire policy.  Id.

In <u>Florida Farm Bureau Ins. Co. v. Birge,</u> 659 So. 2d 310, 313 (Fla. Ct. App. 2d 1994), the Court similarly found a pollution unambiguously excluded coverage for indoor pollution notwithstanding the absence of a definition of the term in the Policy: "Although the pollution clause here does not define the terms "pollutant" or "contaminant," I conclude that it is not ambiguous.  The common, ordinary understanding of those terms as evidenced by the dictionary definition and the witnesses' testimony is that "sewage" is a "pollutant" and "contaminant."  Applying a dictionary definition of "pollutant", the Court found that the presence in a home of raw sewage, capable of transmitting disease and rendering the home uninhabitable, was a "pollutant" under the Policy.

### *The Absence of a Definition, Previously Contained in the Policy,*
### *Does Not Render the Relevant Term Ambiguous*

The fact that the Total Pollution Exclusion Endorsement replaced the section of the

Policy containing the definition of "Pollutant" provides no additional reason for finding the term

"pollutant" to be ambiguous.  As the Court in Scardino v. Am. Int'l Ins. Co., 2007 U.S. Dist.

LEXIS 81567 (E.D. Pa. Nov. 2, 2007) wrote regarding an analogous removal of a definition,

> Despite Plaintiffs' best efforts to blur the meanings of the words "same" and
> "location," and the term "same location," the relevant contractual terms are
> simply not ambiguous, and must therefore be given effect. Plaintiff accurately
> notes that Defendant failed to define these terms in the Renewal, and had it done
> so, such definitions would be dispositive.  See J.C. Penney Life Ins. Co. v. Pilosi,
> 393 F.3d 356, 363 (3d Cir. 2004).  However, as this Court has previously noted,
> "the failure to define a term should not send the Court scurrying to a dictionary
> hunting for ambiguity."  Melrose Hotel Co. v. St. Paul Fire and Marine Ins. Co.,
> 432 F. Supp. 2d 488, 502 (E.D. Pa. 2006), aff'd, Civ. A. No. 06-2755, 503 F.3d
> 339, 2007 U.S. App. LEXIS 22711, 2007 WL 2772061 (3d Cir. Sept. 25, 2007).
> Yet Plaintiffs ask this Court to scurry to new heights.

> Common sense and Plaintiffs' own supplied dictionary definitions illustrate that
> "same location," in the context of homeowner's insurance, refers to a specific
> address.  Though Plaintiffs seek to parse "same" from "location," "a single word
> in an insurance policy should not be read in a vacuum."  Id. at 495.  Moreover,
> simply because a word in a policy may have several definitions, the terms need
> not be ambiguous; "if multiple definitions alone created ambiguity, insurance
> policies would either lose all meaning or would devolve into epic tomes."  Id. at
> 501.

2007 U.S. Dist. LEXIS 81567 ** 8-9.

### *The Sulfur Compounds Released Into Edmonds' Home are "Pollutants"*
### *Under Any Definition*

In Travco v. Ward, the exact sulfur compounds alleged by Edmonds to be "off-gassing"

unambiguously were "pollutants" under the Policy.

> [T]he Court rejects Defendant's argument that Chinese Drywall is not a
> "contaminant" or a "pollutant."  While the Drywall itself may not be a pollutant,
> the gases it releases are.  There is no dispute that the Chinese Drywall has
> released reduced sulfur gases into the Ward Residence.  (See Hejzlar Dec. P 9;
> Def.'s Br. at 4.)  Both state and federal authorities recognize reduced sulfur gases

as pollutants.  See, e.g., Standards of Performance for Kraft Pulp Mill: Standard for Total Reduced Sulfur (TRS), 40 C.F.R. § 60.283 (2000) (regulating emission of "total reduced sulfur"); Prevention of Significant Deterioration Areas, 9 Va. Admin. Code § 5-20-205 (2010) (listing reduced sulfur gases as "criteria pollutants").

2010 U.S. Dist. LEXIS 54387, * 51.[4]

### The Movement of Toxic Chemical Compounds from Drywall to the Air Constitutes "Discharge," "Dispersal," "Seepage," "Migration," "Release," or "Escape" Of Pollutants

The Edmonds Complaint alleges that Chinese Drywall emitted toxic chemical compounds into the air, causing damage and injury.  These allegations fall well within the language of the Total Pollution Exclusion barring coverage for bodily injury or property damage which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

As with the term "pollutant", the terms "discharge," "dispersal," "seepage," "migration", "release" or "escape" are undefined and therefore "must be given their usual, common, and ordinary meaning."  Firemen's Ins. Co. of Washington, D.C., supra, 474 F.Supp.2d at 798.

To "discharge" is to, inter alia, "pour forth; emit," or "to release, send away, or allow to go (often fol. by from )," Webster's New Universal Unabridged Dictionary 561 (2003), or to "allow (a liquid, gas, or other substance) to flow out from where it has been confined," The New Oxford American Dictionary 482 (2d ed. Oxford Univ. Press 2005).  "Dispersal" is "to cause (particles) to separate uniformly throughout a sold, liquid, or gas," Webster's, supra, at 568, or "the action or process of distributing things...over a wide area," Oxford, supra, at 488.  "Seepage" is "the process of seeping," that is "the slow escape of a liquid or gas through porous material or small holes."  Oxford, supra, at 1534.  "Migration" is to "move from one specific part of something to another."  Id. at 1074.  To "release" is "to free from confinement, bondage, obligation, pain, etc.; to let go."  Webster's, supra, at 1627.  And "escape" has been defined as, among other

---

[4]      See also Employers Casualty Co. v. St. Paul Fire & Marine Insurance Co., 44 Cal. App. 4th 545, 556, 52 Cal. Rptr. 2d 17 (1996) (" . . . the parties agree the fumes were 'toxic.'  Thus, sulfur dioxide fumes are a toxic chemical well within any definition of pollutant.").
      Indeed, sulfur gases are recognized as pollutants in CERCLA's  priority list of hazardous substances.  See http://www.atsdr.cdc.gov/cercla/07list.html.

things, "leakage, as of water or gas." *Id.* at 660; *see also Oxford, supra,* at 574 (defining "escape" as "(of a gas, liquid, or heat) leak from a container").

"Common to all of these terms is, obviously, the element of movement. The listing of similar terms such as 'discharge' and 'dispersal,' preceded by the phrase 'actual, alleged, or threatened,' indicates an intent to comprehend all such types and degrees of movement." *Madison [Madison Constr. Co. v. Harleysville Mut. Ins. Co.],* 735 A.2d [100] at 108 [Pa. 1999]. When thus read, the Pollution Exclusion clause applies to the incident at issue. **A pollutant, the epoxy floor sealant, was applied to the surface of the warehouse floor, and it dispersed into the air above and around the warehouse floor, eventually reaching Lewis' office where she later inhaled the toxic fumes**. The Pollution Exclusion clause applies unambiguously to Lewis' allegations, and thus *799 Firemen's owes no duty to defend or indemnify its insureds should Lewis formally pursue her personal injury claim.

474 F.Supp.2d at 798-99 (emphasis added).

The Edmonds' Complaint's allegations that drywall emits "airborne, sulfur-based chemicals" "and/or other toxic chemicals" through "off-gassing'" clearly constitute movement of the sort that the Court in <u>Firemen's Ins. Co. of Washington, D.C.</u> held constituted the "usual, common, and ordinary meaning" of the terms "discharge," "dispersal," "seepage," "migration", "release" or "escape".[5]

### Under Virginia Law, the Term "Pollutant"
### Is Not Limited to So-Called "Environmental Pollution"

The Term "Pollutant" may not be deemed ambiguous by reading into the Total Pollution Exclusion language that is simply not found, i.e., that it applies solely to toxic gases emitted into the external environment. Instead, following <u>City of Chesapeake</u>, every court in Virginia that has considered the issue has held that the term "pollutant" is not limited to environmental pollution.

---

[5]   <u>See also Lefrak Organization, Inc. v. Chubb Custom Ins. Co.</u>, 942 F. Supp. 949, 954 (S.D.N.Y. 1996) ("Common sense tells us that lead paint that never leaves a wall or ceiling does not cause harm. Implicit in the Negligence Complaint . . . must be an allegation that the lead paint somehow separated from the wall or ceiling, and entered the air, or fell on the floor, furniture or fixtures in the apartment.").

As the Court explained in detail in <u>Firemen's Ins. Co. of Washington, D.C.</u>, <u>supra</u>,

The Supreme Court of Virginia did not expressly limit its holding in *City of Chesapeake* to cases involving "traditional" environmental pollution, and there is no reason to believe that it would do so if presented with the facts of the instant case.   The Court explicitly refused to look to the holdings of courts in other jurisdictions which had interpreted similar pollution exclusion provisions.   Rather, the Court simply applied the facts of the case to the language presented in the policy's pollution exclusion clause, and analyzed the results under well-established Virginia contract law.  *See City of Chesapeake,* 628 S.E.2d at 542. Here, the insureds argue that the words "discharge, dispersal, seepage, migration, release or escape" are environmental terms of art which should apply only to discharges of pollutants into the environment.  (R.J. Smith's Mem. at 7) (citing cases).  At the same time, the insureds contend that the Pollution Exclusion clause is not applicable because the facts of this case do not evince a traditional pollution scenario.

The argument belies Virginia's settled principles of contract interpretation. Nowhere in the Policy is there any reference to the word "environment," "environmental," "industrial," or any other limiting language suggesting the pollution exclusion is not equally applicable to both "traditional" and indoor pollution scenarios.  The Pollution Exclusion clause does not say the discharges or dispersals of pollutants must be "into the environment" or "into the atmosphere," or in any way indicate that environmental "incidents" are the only conditions that bar coverage under the clause.  On the contrary, considering the exclusion language in its entirety, it broadly applies to "the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of...any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste...at any time."  The Pollution Exclusion is quite specific.  To hold in favor of the Defendants would require this Court to interject words into the writing contrary to the elemental rule that the function of the court is to construe the contract made by the parties, and not to reformulate a contract for them.  Indeed, Virginia courts have repeatedly refused to employ words not expressed in the parties' original contract, instead construing contracts as written without adding terms that were not included by the parties.

**Nothing in the language of the Policy or the Pollution Exclusion clause at issue suggests that the parties intended only "traditional" or "outdoor" pollution scenarios to be excluded from coverage, and it would be impermissible for the Court to construe the clause as creating an ambiguity where none exists.**   The drafters of the clause could have used words of limitation to exempt indoor (*i.e.,* non-industrial) air pollution from its application, but they did not do so.  The broadness of the exclusionary language, coupled with the parties' failure to specify that the exclusion be limited to only "traditional" or "industrial" pollution, therefore mandates the conclusion that the Pollution Exclusion clause is sweeping, excepting *both* environmental and indoor pollution occurrences from coverage.

21

474 F.Supp. at 796-97 (emphasis added) (citations omitted).

Most recently, the Court in TRAVCO Ins. Co. v. Ward, 2010 U.S. Dist. LEXIS 54387 (E.D. Va. June 3, 2010), rejected the very argument now offered by Edmonds, expressly following Firemans Ins. Co.

> The Court finds Firemans Ins. Co. to be persuasive. Under Virginia law, pollutant exclusions are not limited to "traditional environmental pollution." Although City of Chesapeake did happen to involve traditional pollutants, the Virginia Supreme Court stated its holding in a simple syllogism: Because the harm was caused by the release of a pollutant, the pollutant exclusion applied. This is consistent with basic principles of Virginia insurance law, which has long taken the position that "no court can 'insert by construction, for the benefit of a party, a term not express in the contract.'" Baldwin v. Baldwin, 44 Va. App. 93, 603 S.E.2d 172, 176 (Va. 2004) (quoting Am. Spirit Ins. Co. v. Owens, 261 Va. 270, 541 S.E.2d 553, 555 (Va. 2001)).

2010 U.S. Dist. LEXIS 54387, ** 48-49.[6]

The decisions in Firemen's Ins. Co. of Washington, D.C. and TRAVCO Ins. Co. v. Ward are fully in accord with the Fourth Circuit's analysis of prior versions of the pollution exclusion. In National Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co., 162 F.3d 821 (4th Cir. 1998), the Fourth Circuit rejected the insured's argument that the pollution exclusion was limited to environmental claims. In Gulf Underwriters, a case decided under District of Columbia law although it originated in the Eastern District of Virginia, the National Electrical Manufacturers Association ("NEMA"), a trade association, brought a declaratory judgment action against Gulf Underwriters Insurance Company ("Gulf") seeking coverage and defense costs in connection with direct claims against NEMA by a number of class action welders. The welders alleged NEMA knew the dangers of exposure to manganese in welding fumes but nevertheless

---

[6]   See also E.I. Du Pont de Nemours & Co. v. Admiral Ins. Co., 711 A.2d 45, 60 (Del. Super. Ct. 1995) ("Courts have recently described insureds' attempts to render the pollution exclusions ambiguous as 'something only a lawyer's ingenuity could achieve', and as 'a strange logic'. I agree.") (citations omitted).

promulgated standards for its member companies permitting the use of manganese in welding rods. Specifically, the welders claimed they were "exposed to welding fumes while using welding products or being in the proximity of other persons using welding products," and that, "[a]s a direct and proximate result of their exposure to welding fumes," they suffer neurological injuries. 162 F.3d at 823.

The Gulf policy was an errors and omissions policy with a pollution exclusion that excluded coverage for claims arising directly or indirectly from:

> The actual or threatened discharge, dispersal or release of any *Pollutant*.... This exclusion is effective whether or not the pollution was sudden, accidental, gradual, intended, expected or preventable or whether or not any of *You* caused or contributed to the pollution.

162 F.3d at 824.

NEMA's complaint asserted the welder claims arose from the release of a gaseous pollutant, specifically, "fumes, particulates and gases containing manganese." The district court found the exclusion ambiguous as a matter of law, but the Fourth Circuit took a different view:

> This Court need look no further than the exclusion's plain language to conclude that it explicitly applies to the underlying actions. The exclusion serves to relieve Gulf of its duty to defend claims where those claims arise from "the creation of an injurious condition involving any *Pollutant*." Policy § 5.B.1.n. The exclusion defines "pollutant" to include any "solid, gaseous or thermal irritant or contaminant," including "fumes," and operates to exclude coverage "whether or not [NEMA] caused or contributed to the pollution." *Id.* As NEMA acknowledges, the welder claims arise from the creation of injury resulting from exposure to manganese fumes, and fumes qualify as a pollutant under the exclusion.

162 F.3d at 824-25.

Just as Judge Dohnal did in when considering the dictates of Virginia law, the Fourth Circuit in <u>Gulf Underwriters</u> pointed to District of Columbia law requiring that if the policy is

unambiguous, the court must apply the plain meaning of the language without consideration

extrinsic evidence.

> Gulf's position that the exclusion should be read as written - and not be limited to environmental pollution only - comports with the well-settled rule of District of Columbia law that if a policy is plain and unambiguous the court will construe it without reference to any acts or conduct of the parties thereto which evince their interpretation of such contract.

> That the pollution exclusion at issue here **clearly is not limited to atmospheric or environmental pollution** further supports the argument that it should be enforced as written.

162 F.3d at 825-26 (citations omitted) (emphasis added).[7]

### *Assuming Arguendo the Term "Pollutant" was Deemed Ambiguous, its Resulting Construction in the Light Most Favorable to the Insured Would Still Preclude Coverage*

"Where the language is susceptible to two fair interpretations, the one permitting greater

indemnity will prevail. Montgomery Mut. Ins. Co. v. Dyer, 2001 U.S. Dist. LEXIS 21484 (W.D.

Va. Aug. 28, 2001) (citation omitted). But in the context of Edmonds' allegations, a construction

"permitting greater indemnity" will not preclude summary judgment for the insurer, since the

allegations in the Edmonds Complaint would still be excluded from coverage because they fall

within the strictest reasonable interpretation of the exclusion imaginable.

---

[7]     Numerous decisions from other jurisdictions are in accord, and are consistent with Virginia law in interpreting policy language as written without inserting provisions that are simply not there. See e.g., Nautilus Ins. Co. v. Country Oaks Apartments Ltd., 566 F.3d 452, 457 (5th Cir. 2009) ("Country Oaks also contends that the pollution exclusion does not apply to 'contained pollutants.' Again, there is no support for this limitation in the exclusion's plain language. In terms of movement, the pollution exclusion requires only that the 'pollutant' be . . . 'discharged,' 'dispersed,' or 'released.' Here, the requisite movement clearly occurred because the carbon monoxide at issue accumulated only after being discharged from Schencks' furnace. The mere fact that the carbon monoxide accumulated in the contained space of an apartment, as opposed to the environment generally, does not change this analysis.") (no duty to defend or indemnify under "eight corners" analysis). See also Relaince Ins. Co. v. Moessner, 121 F.3d 895, 902 (3d Cir. 1997) ("The TPE involved here does not use the words 'into the atmosphere' or in any way indicate that 'environmental catastrophes' are the conditions that trigger a bar of coverage under the exclusion. In the absence of this language, we will not construe the provision to create an ambiguity that does not exist.").

"Construed in the light most favorable to the insured, the term pollutant connotes a substance that is harmful or toxic to persons or the environment generally." Regent Ins. Co. v. Holmes, 835 F. Supp. 579, 582 (D. Kan. 1993).  The Edmonds Complaint alleges damage and injury because of toxic gases that are clearly asserted in the Complaint to be "harmful or toxic to persons . . . generally".  The sulfur compounds alleged in the Edmonds Complaint are known pollutants.  As alleged by Edmonds, the emission from drywall of such compounds, rendering homes uninhabitable and causing central nervous system disorders is, in fact, an environmental catastrophe, one brought about by the mere presence of the drywall.  The narrowest possible reasonable interpretation of the exclusion would still preclude coverage for Edmonds' allegations.[8]

## EDMONDS' PROPERTY DAMAGE CLAIMS ARE ALSO PRECLUDED FROM COVERAGE BECAUSE THOSE DAMAGES ARE EXCLUDED UNDER THE POLICY'S "YOUR WORK" EXCLUSION

Notwithstanding Edmonds' generalized allegations of "injuries", see Edmonds Complaint ¶ 53, the only particularized damages Edmonds seeks are for repair or replacement of the house, attendant relocation costs, and "medical monitoring".  See id. ¶ 93.  With the exception of the latter (addressed separately below), these damages are simply those that flow from the alleged failure of the insured to fulfill its contractual obligations, and which are not covered, but instead are expressly excluded from coverage .

A Commercial General Liability policy does not insure the "risk that the contractor may incur liability under warranty".  Nationwide Mut. Ins. Co. v. Wenger, 222 Va. 263, 267 (1981).

---

[8]      See also Westchester Fire Ins. Co. v. Pittsburg, 794 F. Supp. 353, 355 (D. Kan. 1992) ("Where the terms of the policy of insurance are ambiguous, the construction most favorable to the insured must prevail. Accordingly, the court finds that the term 'pollutants' as used in these insurance policies contemplates a substance that is particularly harmful or toxic to persons or the environment generally, and not merely those substances harmful to particular persons or property due to special circumstances.")

See also Boiler Brick & Refractory Co. v. Maryland Cas. Co., 210 Va. 50, 52, 168 S.E.2d 100,
102 (Va.1969) (holding that a policy covering injury and property damage caused by an accident
covers tort liability for such injuries, "not damages resulting from assumed or imposed
contractual liability"). Here, such liability for property damage arising out of the insured's work
is expressly excluded from liability under the "Your Work" exclusion at Endorsement BCG 22
94 11 03.

Decisions by Courts applying Virginia law and involving the "your work" exception have
been limited to cases in which the Policy contained a "subcontractor's exception" to the
exclusion which restored coverage for damages attributable to the work of a subcontractor. See
e.g., Stanley Martin Companies, Inc. v. Ohio Cas. Group, 2009 WL 367589 (4th Cir. Feb. 12,
2009). No such exception exists in the Policy at issue here, or any subsequent renewal thereof,
because Endorsement 22 94 removes the subcontractor exception from the Policy.

In Builders Mut. Ins. Co. v. Kalman, 2009 U.S. Dist. LEXIS 114363 (D.S.C. Dec. 8,
2009), the Court explained why Endorsement 22 94 excluded coverage for property damage to a
home alleged to have been caused by the general contractor's faulty construction.

> This court is the first court in South Carolina and appears to be the first court
> nationwide to analyze the CG 22 94 10 01 endorsement and its application to a
> particular claim. In this case, the Court finds that the property damage claimed by
> the Kimners clearly falls into the "your work" exclusion. As noted above, the
> endorsement CG 22 94 10 01 removes the subcontractor's exception from the
> "your work" exclusion. Without the subcontractor's exception present in Auto
> Owners, the property damage claimed by the Kimners in the Underlying
> Complaint falls within the "your work" exclusion. The faulty workmanship and
> defective construction of the Kimner Residence and resulting water damage is
> "property damage" to work that was performed by Kalman and by subcontractors
> on Kalman's behalf. Because Kalman was the general contractor, for purposes of
> the "your work" exclusion, the entire Kimner Residence was either Kalman's
> work or work performed on Kalman's behalf as defined by the policy, and the
> Kimners only claim property damage to their Residence. In addition, the heavy
> water intrusion sustained as a result of faulty workmanship arose after Kalman
> and its subcontractors had finished their work, meaning the Residence was

included in the "products-completed operations hazard" provision. Therefore, while the "property damage" in this case is caused by an "occurrence" and fits within the initial grant of coverage under the analysis of Auto Owners, the removal of the subcontractor's exception to the "your work" exclusion bars coverage in this case.

2009 U.S. Dist. LEXIS 114363 at ** 16-17.

Here, the Edmonds' complaint alleges that Builders Mutual's insured, Parallel, was (together with one other defendant) the "builder" of Edmonds' home. Thus, the entire residence was Parallel's "work" and all alleged property damage is excluded from coverage.

## EDMONDS' REQUEST FOR "MEDICAL MONITORING" IS NOT COVERED

Claims for medical monitoring do not constitute present claims fore bodily injury and as a result are not covered by the Policy. See HPF, L.L.C. v. General Star Indem. Co., 338 Ill. App. 3d 912, 918 (Ill. Ct. App. 2003) ("[T]he establishment of a medical monitoring fund cited by the trial court as an allegation of bodily injury, is nothing of the sort.").

## CONCLUSION

Under any common sense understanding of its terms, the Policy's Total Pollution Exclusion unambiguously excludes from coverage Edmonds' allegations of "toxic" "sulfur gases" and other "toxic chemicals" that are "air-borne", cause egregious bodily injuries, and damage residences to the point that they are unlivable. Builders Mutual Insurance Company respectfully requests that summary judgment be entered in its favor declaring it owes no duty to defend, and therefore no duty to indemnify, its insured with regard to the Edmonds suit.

Date:   October 19, 2010                    Respectfully submitted,

                                            BUILDERS MUTUAL INSURANCE COMPANY
                                            By Counsel

SANDS ANDERSON PC


_____/s/_____
Danny M. Howell        VSB No. 30352
Michael T. Marr        VSB No. 48536
Mikhael D. Charnoff    VSB No. 43929
Courtney S. Schorr     VSB No. 65971
SANDS ANDERSON PC
1497 Chain Bridge Road, Suite 202
McLean, VA  22101
Telephone: (703) 893-3600
Facsimile: (703) 893-8484
*Counsel for Builders Mutual Insurance Company*

and

Jeffrey H. Geiger       VSB No. 40163
SANDS ANDERSON PC
1111 East Main Street, 24th Floor
P. O. Box 1998
Richmond, Virginia 23218-1998)
Telephone: (804) 783-7248
Facsimile:  (804) 783-7291
E-mail:  jgeiger@sandsanderson.com
*Counsel for Builders Mutual Insurance Company*


## CERTIFICATE OF SERVICE

        I hereby certify that on October 19, 2010, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

                    Richard G. Collins, Esquire
                    Gilbert A. Bartlett, Esquire
                    Gilberg A. Bartlett PC
                    809 Richmond Rd
                    Williamsburg, VA 23185
                    (757) 229-1910

Fax: (757) 229-7323
Email: rcollins@gilbertabartlett.com
*Counsel for Parallel Design & Development LLC*

and

Richard James Serpe, Esquire
Law Offices of Richard J. Serpe, P. C.
580 E Main St
Suite 310
Norfolk, VA 23510
(757) 233-0009
Fax: (757) 233-0455
Email: rserpe@serpefirm.com

Jeffrey Arnold Breit
John Webb Drescher
Michael F. Imprevento
Breit Drescher & Imprevento PC
1000 Dominion Tower
999 Waterside Dr.
Norfolk, VA 23510-3320
(757)670-3884
Fax: (757) 299-8035
Email: jbreit@bdbmail.com
jdrescher@breitdrescher.com
mimprevento@ breitdrescher.com

Frederick Steven Longer
Levin Fishbein Sedran & Berman
510 Walnut Street
Suite 500
Philadelphia, PA 19106
(215) 592-1500
Fax: (215)592-4663
Email: flonger@lfsblaw.com
*Counsel for Ricky L. Edmonds*

/s/
Danny M. Howell          VSB No. 30352
dhowell@sandsanderson.com
Sands Anderson PC
1497 Chain Bridge Road, Suite 202
McLean, VA 22101
703-893-3600 Phone
703-893-8484 Fax