**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **BUILDERS MUTUAL INSURANCE COMPANY** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **PARALLEL DESIGN & DEVELOPMENT LLC** | ) **Civil Action No. 4:10-cv-00068** |
| **and** | ) **(formerly 3:09cv800)** |
| **RICKY L. EDMONDS** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## DEFENDANT RICKY L. EDMONDS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Ricky L. Edmonds in opposition to Plaintiff's Motion for Summary Judgment and in support thereof sets forth the following.

## INTRODUCTION

Pursuant to well settled law and based upon the allegations of the Edmonds Complaint as well as the manner in which the Total Pollution Exclusion endorsement is framed in the only policy relevant to the Subject Action, it will be urged herein that Builders Mutual Insurance Company ("BMIC") has a clear duty to defend and indemnify its insured, Parallel Design & Development LLC ("Parallel") with respect to the lawsuit brought by Ricky L. Edmonds ("Edmonds") ("Defendant").  Mr. Edmonds is seeking damages from his builder due to the presence of Chinese drywall in his home.

The presence of several undefined terminologies in the Total Pollution Exclusion endorsement (Document 55-2, page 35) creates myriad ambiguities in the context of the subject

loss. Key terms such as "pollution", "pollutant", "migration" and "seepage" and the like are understood by reasonable persons to involve traditional pollution events that impact the environment. The allegations of Edmonds' complaint do not define an environmental incident of pollution, do not identify a "pollutant", do not define a release into the environment, and does not allege a discharge, dispersal, seepage, migration, release or escape as those terms are commonly understood by reasonable persons.

Under Virginia law, language is considered to be ambiguous when it can be understood in more than one way or when such language refers to two or more things at one time. *Lincoln Nat. Life Ins. Co. v. Commonwealth Corrugated Container Corp.*, 229 Va. 132, 137, 327 S.E.2d 98, 101 (Va. 1985); *Salzi v. Farm Bureau Mut. Ins. Co.*, 263 Va. 52, 55-56, 556 S.E.2d 758, 760 (Va. 2002). In the face of such ambiguity, courts will interpret the policy language most strongly against the insurer and in favor of coverage. Ambiguity is defined as "uncertainty or inexactness of meaning in language." *See* New Oxford American Dictionary (2nd ed.).

This ambiguity is magnified in the context of a Chinese drywall loss, where the lack of any definition of the terminology in the subject policy renders Edmonds' urged interpretations as set forth below preeminently reasonable, thereby obligating the insurer to provide coverage pursuant to both a duty to defend and indemnity. It is respectfully submitted that federal and Virginia statutes regarding pollution specifically exclude as a pollution event the air in a residence or business.

Also, the "your work" exclusion is not amenable to disposition on summary judgment as the complaint does not itself disclose sufficient particulars to avoid the broad scope of the duty to defend in Virginia and the policy is framed in such a way that extrinsic evidence is required to

2

determine the scope of the exclusion.  It also does not even apply upon examination of the face of the policy.

## EDMONDS' RESPONSE TO BMIC'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.  Admitted, to the extent that the Defendant Edmonds is not advised as to the circumstances under which the policy was delivered to Parallel Design & Development LLC and is accepting the contents of the policy as represented by BMIC.

2.  Admitted.

3.  The Defendant Edmonds is not advised as to the circumstances of BMIC's defense of Parallel under a reservation of rights.  It does not appear that Parallel has retained independent counsel to pursue the issue of BMIC's apparent breach of contract.

4.  The complaint at Paragraph 11 does not allege the specific nature and amount of the gases and uses the disjunctive "and/or" in connection with the term "toxic chemicals", also undefined, as well as "off-gassing," the mechanism of which is similarly undefined since the actual manner in which the compounds are synergistically created is uncertain.  The allegations of Paragraph 11 do not exceed the confines of Edmonds' home and suggest that the drywall is the source of the emission of the various compounds, though undefined, in the "family home."

5.  The chemical compounds as set forth in Paragraph 12 are undefined and are not within the categories of "pollutants" as commonly understood.  Edmonds disputes factually that he has alleged that a "pollutant" is present in his home and generally

alleges that the compounds are "capable of" harming individuals alleging only "headaches."

6. The compounds are undefined as set forth in Paragraph 58 and only speaks of "latent" effects and the Defendant further disputes that such substances are "pollutants" as commonly understood and defined.

7. The Defendant disputes that the undefined "sulfur-based chemicals" are "pollutants" as commonly understood and defined in light of their location, amount, genesis and unspecified nature.

8. The coverage section set forth speaks in relevant part for itself.

9. The coverage section set forth speaks in relevant part for itself.

10. The TOTAL POLLUTION EXCLUSION ENDORSEMENT speaks for itself.

11. The exclusion (f) endorsement is ineffective, having been replaced, and the term "pollutant" remains undefined in the subject and relevant policy of insurance as set forth in the Affidavit of Carl Warbington, who sets forth that the Policy No. CP 001633403 issued to Parallel is the subject policy.

12. It is undisputed that the policy is worded as set forth by BMIC in Paragraph 12 on pages 5 and 6 of its brief.

13. Endorsement BCG 22 94 11 03 of the Builders Mutual 2006-2007 Policy speaks for itself. It is factually disputed based upon the matters set forth in the Defendant's Memorandum in Opposition that the "your work" exclusion as defined is applicable and demands examination of extrinsic evidence including the Manual of Rules of BMIC given the provisions of 11a and 11c of the subject policy at pages 48 and 49 of 67 of Document 1-1.

14. Admitted.

15. Defendant Edmonds objects to the consideration of any policies delivered outside the relevant policy period inasmuch as BMIC should be estopped from requesting consideration of those matters outside the "eight corners", which it itself indicates is solely relevant, namely, the subject 2006-2007 policy, the complaint, and other matters deemed appropriate for consideration. Anything other than that is irrelevant and inadmissible given the current procedural posture of the case.

## FURTHER LISTING OF DISPUTED FACTS

1. As a consequence of the defective product in use in Edmonds' home, the subject compounds and gases are undefined and further unspecified in terms of quantity and nature.

2. The Edmonds complaint does not allege a loss occurring in the environment as commonly understood and does not allege that the various compounds and gases set forth in the complaint originated other than from the use of the product within the confines of the Edmonds home.

3. The complaint does not disclose specific impacts to the health of Edmonds in his capacity as Plaintiff that would define the subject compounds and gases as "pollutants" and the gases and compounds don't originate from the outdoor air or environment.

## ARGUMENT

### A. Duty to defend in Virginia

The duty to defend is controlled by the interpretation of the insurance policy.  The terms of the policy should be construed in light of their subject matter and the words "should be given their natural and ordinary meaning as understood in the business world."  *See* London Guarantee & Acc. Co. v. C.B. White & Bros., 188 Va. 195 (1948).

In construing an insurance policy, the Virginia courts follow a combination of the Exclusive Pleading Rule and the Potentiality Rule.  See Solers, Inc. v. Hartford Mut. Ins. Co., 146 F. Supp. 2d 785 (E.D. Va. 2001).  The former provides that the duty to defend is determined solely by the claims asserted in the pleadings, and the latter provides that the duty to defend is triggered if there is any "potentiality" that the allegations could state a claim covered by the policy.  *Id.  See also* Brenner v. Lawyers Title Ins. Corp., 240 Va. 185, 397 S.E.2d 100 (1990). An insurer is relieved of the duty to defend "only when it clearly appears from the initial pleading the insurer would not be liable under the policy contract for *any* judgment based upon the allegations."  *See* Reisen v. Aetna Life and Casualty Co., 225 Va. 327, 302 S.E. 2d 529 (1983).  All insuring provisions are construed broadly and any ambiguity is construed liberally in favor of the insured, and strictly against the insurer.  Solers, Inc., *supra.* at 789.

Insurance policies are contracts whose language is ordinarily selected by insurers rather than by policyholders.  The courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it.  Where two constructions are equally possible, that most favorable to the insured will be adopted.  Language in a policy purporting to exclude certain events from coverage will be construed most strongly against the insurer.  *See* St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., 227 Va. 407, 411, 316 S.E.2d 734, 736 (1984) (emphasis added) citing Ayres v. Harleysville Mut. Cas. Co., 172 Va. 383, 2 S.E.2d 303

(1939); <u>Fidelity & Casualty Co. v. Chambers</u>, 93 Va. 138, 24 S.E. 896 (1896); <u>United States Mutual Accident Assn. v. Newman</u>, 84 Va. 52, 3 S.E. 805 (1887). "Doubtful, ambiguous language in an insurance policy will be given an interpretation which grants coverage, rather than one which withholds it." <u>Granite State Ins. Co. v. Bottoms</u>, 243 Va. 228, 234, 415 S.E.2d 131, 134, 8 Va. Law Rep. 2136 (1992).

While any ambiguity must be resolved against the insurer, the construction adopted should be <u>reasonable</u>, "and absurd results are to be avoided." <u>Transit Casualty Co. v. Hartman's Inc.</u>, 218 Va. 703, 708, 239 S.E.2d 894, 896 (1978) (emphasis added).

The contract is construed as written, without adding terms that were not included by the parties. <u>Wilson</u>, 227 Va. at 187, 313 S.E.2d at 398. When the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning. <u>Bridgestone/Firestone Inc. v. Prince William Square Assocs.</u> 250 Va. 402, 407 463 S.E.2d 661, 664 (1995). "Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." <u>D.C. McClain, Inc. v. Arlington County</u>, 249 Va. 131, 135-36, 452 S.E.2d 659, 662 (1995); *see also* <u>Scottsdale Ins. Co. v. Glick</u>, 240 Va. 283, 288, 397 S.E.2d 105, 108 (1990); <u>American Health Ins. Corp. v. Newcomb</u>, 197 Va. 836, 842-43, 91 S.E.2d 447, 451 (1956); <u>Ames v. American National Bank</u>, 163 Va. 1, 38-39, 176 S.E. 204, 216-17 (1934). The popular and reasonable meaning of "pollution" is not consistent with the Chinese drywall loss in the confines of the Edmonds home.

It is respectfully requested that this Court, consistent with the holding in <u>Fuisz v. Selective Ins. Co. of America</u>, 61 F.3d 238 (4th Cir. 1995), should hold that given the ambiguity in the definitions of the terms "pollution" and "pollutant" and where the Edmonds' pleading

alleges facts and circumstances, some of which if proven would fall under a risk covered by the policy, that BMIC is obliged to defend its insured with the issue of duty to indemnify appropriate for resolution pending the disposition of the underlying controversy as set forth in the Edmonds' Complaint, already filed in a court of appropriate jurisdiction in a venue of his selection.

**B.    Divergence of judicial opinion on the applicability of the policy exclusions suggests inherent ambiguities therein and are evidence of reasonable equally plausible meanings**

Many courts have held that the mere "fact that there is a difference of judicial opinion with respect to the proper construction of given language found in policies of insurance is at least evidence of an ambiguity within the rule that ambiguous language should be construed most strongly against the insurer and most favorably to the insured."[1] *See* Charles C. Marvel, LL.B., "Division of opinion among judges on same court or among other courts or jurisdictions considering same question, as evidence that particular clause of insurance policy is ambiguous," 4 A.L.R.4th 1253, § 2[a] (originally published in 1981) (cases cited therein). *See, e.g.*, Stroehmann v. Mutual Life Ins. Co., 300 U.S. 435, 439 (1937); Minnesota Mut. Life Ins. Co. v. Marshall, 29 F.2d 977, 978 (8th Cir. 1928), *cert. denied*, 279 U.S. 851 (1929) (conflicting lines of judicial "decisions ... themselves establish doubt as to the construction and meaning of the provisions which we are called upon to interpret."); Bayersdorfer v. Massachusetts Protective Ass'n, 20 F. Supp. 489, 492 (S.D. Ohio 1937), *aff'd*, 105 F.2d 595 (6th Cir. 1939) ("where the courts are substantially in hopeless conflict, it cannot be said that the meaning is clear or unambiguous."); Travelers Indem. Co. v. Summit Corp. of America, 715 N.E.2d 926, 936 (Ind. Ct. App. 1999) ("A division between courts as to the meaning of the language in an insurance

---

[1] Edmonds is mindful of the Supreme Courts holding in Nationwide v. Wenger, 222 Va. 263, 278 S.E.2d 874 (1981) but submits that in the context of an undefined policy term, other Court's considerations of the undefined terms are persuasive given the "reasonableness" standard and the fact that in the pollution context, the complex nature of the inquiry demands examination of how the terms have been defined in various settings to properly determine contractual intent.  The current exclusions at issue also post-date Wenger.

contract is evidence of ambiguity."); <u>Security Ins. Co. of Hartford v. Investors Diversified, Ltd.,</u> 407 So. 2d 314, 316 (Fla. App. 4th Dist. 1981) (conflicting holdings between Fifth Circuit Court of Appeals and California Supreme Court regarding interpretation of identical language "offer[ed] as proof of that pudding" – that ambiguity exists); <u>Cohen v. Erie Indem. Co.</u>, 432 A.2d 596, 599 (Pa. Super. 1981) (existence of conflicting opinions "creates the inescapable conclusion that the provision in issue is susceptible to more than one interpretation."); <u>Zanfagna v. Providence Washington Ins. Co.,</u> 415 A.2d 1049, 1051 (R.I. 1980) ("This diversity of judicial thought, in our opinion, is proof positive of the ambiguities found in the policy."); <u>Allstate Ins. Co. v. Hartford Acc. & Indem. Co.,</u> 311 S.W. 41, 45 (Mo. App. 1958) (finding ambiguity with different courts' interpretations of the word "permission"); <u>Alvis v. Mutual Ben. Health & Acc. Ass'n,</u> 201 Tenn. 198, 204-05, 297 S.W.2d 643, 645-46 (1956) (conflicting decisions demonstrate ambiguity); <u>George H. Olmsted & Co. v. Metropolitan Life Ins. Co.,</u> 118 Ohio St. 421, 427-28, 161 N.E. 276, 277-78 (1928) ("the fact that such respectable authority is in irreconcilable conflict, and was so long prior to the execution of the insurance contracts here under consideration, … presents such persuasive argument of the ambiguity of the clause"); *but see* <u>Nationwide Mut. Ins. Co. v. Wenger</u>, *supra* (refusing to "convert an otherwise unambiguous CGL policy into a performance bond" in favor of insured even though a number of jurisdictions interpreted relevant clause differently).

The reasoning employed to arrive at this conclusion is that "one cannot expect a mere layman to understand the meaning of a clause respecting the meaning of which fine judicial minds are at variance." 4 A.L.R.4th 1253, § 2[a].

That "pollutant" or "pollution" can be interpreted by reasonable persons in different ways is undeniable. Compelling arguments have been made that since reasonable judges have come to

differing judicial interpretations of the same policy language, this is arguably dispositive evidence of the existence of multiple "reasonable" interpretations, thereby mandating coverage pursuant to Virginia law and arguably the law of several jurisdictions. *See* <u>Virginia Farm Bureau v. Williams,</u> 278 Va. 75, 81, 677 S.E.2d 299, 302 (2009).   If courts arrive at different interpretations of identical contract provisions, then it is hard to imagine how the provision could be said to be unambiguous, or at the very least it would be "reasonable" to interpret the pollution exclusion clause in the fashion urged by Mr. Edmonds herein.   This conclusion becomes <u>more</u> compelling when the terms which BMIC urges to avoid coverage are undefined.   In <u>Fireman's Ins. Co. of Washington, D.C. v. Kline and Son Cement Repair</u>, 474 F. Supp. 2d 779 (E.D. Va. 2007)[2], cited by BMIC, the court noted that in consideration of the terms "pollution" or "pollutant" coupled with the words "discharge, dispersal, seepage, migration, release or escape" – clearly environmental clean-up terms of art – there is an absolute split in Federal and State Courts:

> Jurisdictions are split as to the meaning of the terms "discharge, dispersal, seepage, migration, release or escape."
>
> These methods of travel requirements have been both narrowly and broadly construed by various jurisdictions, usually depending upon whether that jurisdiction views pollution as limited to traditional, industrial and environmental pollution or not.  Lee R. Russ and Thomas F. Segalia, 9 *Couch on Insurance* 3d Section 127:9 at 127-28 (West 2005).  Numerous courts have held that a pollution exclusion bars coverage for all injuries caused by the release of pollutants, even when the pollutant is dispersed into a confined or indoor area. *Id.* n.1.  In contrast, other courts have held that the exclusion does not apply if the facts show that the discharge, dispersal, release or escape was a localized toxic accident occurring within the vicinity of the pollutant's intended use. *Id.* Section 127:9 at 127-128 to 127-29 n.2.

---

[2] It is respectfully submitted that the learned court might have ruled differently if individual counsel had urged the "reasonableness" standard critical to interpretation of insurance contracts in Virginia.  Nowhere in the opinion is the standard directly analyzed-it would seem that the numerous high court decisions in agreement with the interpretive position of the insured would be strong evidence of a reasonable interpretation of ambiguous terms mandating coverage.  This would particularly be true when a key term is as here undefined.

474 F. Supp. 2d at 794.  Cf. Roinestad v. Kirkpatrick, 2010 WL 4008895, *5 (Colo. App. Oct. 14, 2010) ("insurer has failed to sustain its burden of demonstrating that the pollution exclusion applies due to the discharge of hydrogen sulfide").  This split in authority favors a ruling that a duty to defend and indemnify to Parallel exists.

**C.      The structure, content and context of the "Total Pollution Exclusion" is inherently ambiguous as well as the terms "pollution", "pollutant", "seepage", "migration" "release" and "escape".**

As set forth in the policy under new "Subsection f", the following is set forth:

Exclusion f. under Paragraph **2., Exclusions of Section I – Coverage A- Bodily Injury and Property Damage Liability** is replaced by the following:

This insurance does not apply to:

f.      Pollution
(1)     "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

(2)     Any loss, cost or expense arising out of any:

(a)     Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(b)     Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

In connection with undefined terms as BMIC concedes is the subject case, our Virginia state and federal courts have resorted to other judicial opinions as well as myriad other extrinsic sources of guidance to include dictionary definitions to divine contractual intent.  In The Morrow Corporation v. Harleysville Mut. Ins. Co., 110 F. Supp.2d 441 (E.D. Va. 2000), the District Court was faced with an evaluation of the terms "first manifests itself" in connection with the

definition of "occurrence" in a dispute involving the duty to defend in the pollution damage

context. The Court noted that settled Virginia law teaches that insurance policies are "contracts

whose terms are construed in accordance with the general principles applicable to all contracts."

Dairyland Insurance v. Douthat, 248 Va. 627, 449 S.E.2d. 799, 801 (1994). Further, the Court

also noted that a contract was ambiguous when a term may be understood in more than one way

or when it refers to two or more things at the same time. *Id.*, *citing* Smith v. Allstate Ins. Co.,

241 Va. 477, 403 S.E.2d 696, 697 (1991). The Court at the outset noted that the term used by the

policies to define a "occurrence", namely "manifest"—supports a range of meanings. 110 F.

Supp. 2d at 449. The Court utilized dictionary sources to come to the determination that it had

multiple variations and meaning. The Court attempted to narrow the application of these varied

meanings in the specific context of the pollution exclusion loss, namely the subject loss, which

was PCE contamination, noting that a term must be examined "within its context" to determine

the existence of ambiguity. And only in doing so is the parties' contractual intent given proper

effect. Gates, Hudson & Assoc. v. Federal Ins. Co., 141 F.3d 500, 502 (4th Cir. 1998). The

Court concluded in the context of PCE contamination damage that the term included a

reasonable definition consistent with the fact that something may have "manifested itself" when

it would have been discoverable through reasonable testing, thereby bringing it into the effective

terms of the duration of each of the applicable Sentry policies. The Court stated:

> Even if as Sentry urges "manifest" could be taken also to mean
> "discovered" there would be "at most, an ambiguity in the meaning of
> "manifest" in this case, because "discoverable" as shown, *supra*, is at the
> very least an equally plausible definition of the term. The existence of such
> an ambiguity requires application of well settled rules of construction as
> aids in the interpretive enterprise...an ambiguous term must be accorded the
> meaning that a reasonable person in the position of the insured would have
> given to the term and that is consistent with the reasonable expectations of a
> person in the insured's position for it is well settled in Virginia and in all
> other jurisdictions that ambiguities in meaning are resolved in favor of the

insured. *See,* e.g., <u>St. Paul Fire & Marine Insurance Co. v. S.L. Nusbaum & Co. Inc.</u>, 227 Va. 407, 316 S.E.2d 734, 735-36 (1984)  This is so because an insurer generally drafts and ultimately is responsible for the language in an insurance contract and any ambiguities in the drafter's choice of language are construed *contra preferentem* or against the drafter.  *See* <u>U.S. Fidelity & Guaranty Co. v. McGlothlin</u>, 240 Va. 21, 392 S.E.2d 814, 815-16 (1990). Thus as the Supreme Court of Virginia has stated, "because the principle purpose of insurance is protection and insurance policies are drafted by insurance companies, if the language of the policy is capable of different interpretations, we will construe it in favor of coverage or indemnity and against a limitation of coverage."  <u>United Services Auto Assoc. v. Webb</u>, 235 Va. 655, 369 S.E.2d 196, 198 (1988)…in particular, though an insurer may limit its liability in the insurance contract, where exclusions to and limitations to the coverage provided by an insurer are not drafted plainly and unambiguously, they will be construed against the insurer and in favor of coverage so as not to defeat the purpose of insurance.  <u>Lower Chesapeake Assoc. v. Valley Forge Co.</u>, 260 Va. 77, 532 S.E.2d 325 (2000)  These guides to the construction of the Sentry policy language compel the conclusion that even if "manifest" is deemed ambiguous as possibly meaning both discoverable and discovered, the Sentry policies must nevertheless be construed to provide coverage when property damage becomes discoverable.  Adopting Sentry's definition of "manifest" would not only be contrary to the plain meaning of the term "manifest" but would also run counter to these principles of construction and in favor the insured and of coverage in the face of Sentry's failure unambiguously to clearly define "manifest."

110 F. Supp.2d at 455

When presented with undefined policy terms, Virginia courts have also sought guidance from either Black's Law Dictionary or other dictionary sources to find context and definition to undefined terms in contracts of insurance.  *See* <u>BMA Capital Ins. Co. v. US Airways, Inc.</u>, 271 Va. 352, 626 S.E.2d 369 (2006) (Supreme Court of Virginia utilized such sources to define the terms "payment" under the policy as well as the word "recoveries")  Consideration of these sources in the instant context of the Chinese drywall loss, or in any context, sets forth undeniably that the term "pollution" necessarily involves the introduction or presence of a "pollutant" as the result of a definable event <u>into the environment</u>.

The various dictionary definitions of "pollution" include the following:

1. The act of polluting or the state of being polluted. *Available at http://dictionary.reference.com/browse/pollution.*
2. The introduction of harmful substances or products into the environment: *air pollution. Id.*
3. Harmful or poisonous substances introduced into an environment. <u>World English Dictionary</u> *available at http://dictionary.reference.com/browse/pollution.*
4. Sense of "contamination of the environment" first recorded c.1860, but not common until c.1955. Pollute (v.) is attested from c.1380 in sense "defile" from L. pollutes, pp. of polluere. Meaning "contaminate the environment" first recorded 1954. <u>Online Etymology Dictionary</u>, *available at http://dictionary.reference.com/browse/pollution.*
5. The contamination of air, water, or soil by substances that are harmful to living organisms. Pollution can occur naturally, for example through volcanic eruptions, or as the result of human activities, such as the spilling of oil or disposal of industrial waste. <u>The American Heritage® Science Dictionary</u>, *available at http://dictionary.reference.com/browse/pollution.*
6. The action of polluting especially by environmental contamination with man-made waste. *Available at www.merriam-webster.com/dictionary/pollution.*
7. "The presence and/or introduction into the environment of the substance or things that have harmful or poisonous effects." <u>New Oxford English Dictionary 2nd Edition.</u>

In addition, the Virginia General Assembly has consistently defined "pollution" as specifically an environmental or outdoors event, such as:

1. **"Pollution"** means such alteration of physical, chemical, or biological properties of any state waters as will or is likely to create a nuisance or render such waters (a) harmful or detrimental or injurious to the public health…; (b) unsuitable with reasonable treatment for use…; or (c) unsuitable for…reasonable uses. *See* Va. Code Ann. § 62.1-44.3.
2. **"Pollution"** means such alteration of physical, chemical, or biological properties of any state waters resulting from sediment deposition as will or is likely to create a nuisance or render such waters (i) harmful…to the public health…or to the health of animals, fish or aquatic life. *See V*a. Code Ann. § 10.1-1181.1.
3. **"Air Pollution"** means the presence in the <u>outdoor</u> atmosphere of one or more substances which are or may be harmful or injurious to human health, welfare or safety…or which unreasonably interfere with the enjoyment by the people of life or property. *See* Va. Code Ann. § 10.1-1300 (emphasis added).
4. **"Pollution prevention"** means eliminating or reducing the use, generation or release at the source of environmental waste. *See* Va. Code Ann. § 10.1-1425.10.

The burden is on the insurer to prove that an exclusion applies. <u>White v. State Farm</u>, 208 Va. 394, 396, 157 S.E.2d 925, 927 (1967). In fact, the burden is on the insurer to prove that the exclusion applies to the facts of the case. <u>Johnson v. INA</u>, 232 Va. 340, 345, 350 S.E.2d 616, 619 (1986).

14

The terms "pollution" and "pollutant" as set forth in the subject policy of insurance are oft-repeated environmental terms of art such as "seepage" and "migration"[3] are not so defined. When considered as presented in the Total Pollution Exclusion, these terms have been construed by learned jurists throughout this country in a manner consistent with Edmonds' interpretation. Edmonds submits that this should be conclusive evidence <u>as a matter of law</u> that the interpretation of these undefined terms, given their popular meaning, not only gives rise to a duty to defend, but also a duty to indemnify.

The Edmonds Complaint sets forth allegations of a defective product creating conditions wherein unspecified amounts of unspecified compounds occur in the confines of a home. These allegations are not consistent with the understanding of "pollution" in the minds of any reasonable homeowner. It is the concept of "reasonableness," also central to Virginia law, that underscores Edmonds' argument and mandates both a duty to defend and indemnify on the part of BMIC. As set forth in <u>Lower Chesapeake</u>, *supra*, the Supreme Court of Virginia held that insurance provisions that permit more than one reasonable interpretation are ambiguous and will be construed in a manner that provides coverage. *See also* <u>Granite State Ins. Co. v. Bottoms</u>, 243 Va. 228, 233, 415 S.E.2d 131, 134 (1992); <u>Andrew v. American Health & Life Ins. Co.,</u> 236 Va. 221, 224, 372 S.E.2d 399 (1988) (the maxim *noscitur a sociis* mandated that the phrase "nervous disorder" when read in connection with other words in the exclusion could reasonably be construed to involve both physical disorders and mental disorders, and, therefore, the insured's construction of the term was reasonable and construed against the insurance company and in favor of coverage.)   In this instance, BMIC's failure to properly and clearly define the exclusionary term contained in the policy in the Total Pollution Exclusion should result in a

---

[3] In a later portion of this memorandum, Edmonds sets forth that these terms are based on and indeed originate in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C.A. §§ 96001 et seq.

decision in favor of coverage for the insured's loss. As demonstrated, Edmonds' interpretation of the policy at issue as covering traditional environmental pollution has support not only in Virginia statutes and traditional dictionary definitions, but in the context of the subject exclusion itself.

Paragraphs 2(a) and (b) of the Total Pollution Exclusion underscore Edmonds' argument that provisions such as the Total Pollution Exclusion came to fruition as the result of the concern on the part of national insurance companies like BMIC using identical ISO forms nationally that the cost of statutory or regulatory government mandated "Superfund" type cleanups would ultimately be borne by them. These provisions were undeniably in response to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA" or "Superfund")[4] and similar legislation such as the Resource Conservation and Recovery Act[5], the Clean Water Act[6], and the Clean Air Act[7]. There is ample authority for consideration of all the wording of the whole exclusion is needed to determine its context in order to allow the provision to be read as a whole. *See* Andrews v. American Health & Life Ins. Co., *supra*. In Nav-its Inc. v. Selective Ins. Co. of America, 869 A.2d 929, 930 (N.J. 2005), the New Jersey Supreme Court concluded that the pollution exclusion precluded recovery only for "traditional types" of pollution and refused to find that the exclusion was applicable to the claims by the policy holder in the context of a release of fumes in an office space. In that case, the pollutants were defined as "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* at 932. Central to the Court's analysis was an examination of the drafting history and purposes behind the pollution exclusions including the

---

[4] 42 U.S.C.A. §§ 96001 et seq.
[5] 42 U.S.C.A. § 6901 et seq.
[6] 42 U.S.C.A. § 121 et seq.
[7] 42 U.S.C. § 1857 et seq., as amended

undeniable fact that such terminologies appeared to address expanding liability under CERCLA. *Id.* at 936. The Court concluded that the pollution exclusion "in its various forms demonstrates that its purpose was to have a broad exclusion for traditional environmentally related damages." *Id.* at 936-37.

In Belt Painting v. TIG Ins. Co., 795 N.E.2d 15 (N.Y. 2003) the Court of Appeals in the State of New York came to a similar conclusion, refusing to apply the pollution exclusion, even though "defined" in the policy as a result of bodily injury resulting from the inhalation of fumes in an office space. In consideration of the words "pollution" and "environment", the Court declined to apply the exclusion based upon its undeniable purpose. In that case, the policy broadly defined "pollutants" to include "fumes" and the New York Court of Appeals was reluctant to adopt an interpretation that would infinitely enlarge the scope of the term "pollutant" and seemingly contradict both a "common speech understanding of the relevant terms and the reasonable expectations of a business person." *Id.* at 387. The Court ultimately concluded "it cannot be said that this language unambiguously applies to ordinary paint or solvent fumes that drifted a short distance from the area of the insured's intended use and allegedly caused inhalation injuries to a bystander." *Id.* at 387-388.

In NGM Insurance Co. et al. v. Carolina's Power Wash & Painting LLC et al., No. 08-3378, 2010 U.S. Dist. LEXIS 2362 (D.S.C. Jan. 13, 2010), the policy holder faced potential liability for alleged injuries suffered by postal workers during painting of the post office. In that case, even though "pollutants" was actually defined to include any "irritant or contaminant" as well as "fumes" the Court considered the exclusion ambiguous in such a context and found that "no discharge, dispersal, seepage, migration, release or escape" occurs when such fumes drift a short distance from the work area. As a result, the District Court found the exclusion ambiguous,

and in accordance with basic tenets of policy interpretation identical to those applicable pursuant to Virginia law, construed it in favor of the policy holder.

In National Casualty Ins. v. Ally and Transport, Inc., 8-09-1539 2010 U.S. Dist. LEXIS 15004 (S.D. Tex. Feb. 22, 2010), the policy holder's trailer exploded and killed a maintenance worker. In this suit, it was alleged that the trailer had been used to transfer oil that left a "dangerous and explosive residue" in the trailer. As a result, the insurer filed a declaratory judgment action, citing a pollution exclusion that was fully defined. Despite the definition similar to those that have appeared in other cases, the District Court held that the exclusion did not bar coverage and was ambiguous inasmuch as the underlying injury did not involve a "discharge, dispersal, seepage, migration, release or escape." Although the policy language was different the Court was in agreement with cases finding that the exclusion applies only to "traditional" pollution discharge into the environment. Similarly, in Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178 (6th Cir. 1999), the absolute pollution exclusion did not preclude coverage for injuries caused by toxic substances confined to the general area of their intended use. The trial court had considered the case of a teacher who was injured as a result of fumes from chemicals used to seal a floor in the school where the teacher worked. Even in the face of the parties' agreement that the sealant constituted a "pollutant", the trial court ruled for the insured, stating

> The pollution exclusion clause is intended to protect the insurer from liability for the enforcement of environmental laws. The exclusion contains environmental terms of art because it is intended to exclude coverage only as it relates to environmental pollution. When a toxic substance is confined to an area of intended use it does not come under the exclusion clause.

Id. at 1180-1181.

The Court held "no reasonable person could find that the insurance policy at issue unambiguously excluded coverage for injuries suffered by an employee who was legitimately in the immediate vicinity of the chemicals, and the injury occurred only a few feet from where the chemicals were being used." *Id.* at 1183. Given such reasoning, why would BMIC's insured's interpretation be any less reasonable? Numerous learned high courts across the country have similarly concluded that coverage exists. BMIC's insured therefore advances a reasonable interpretation of purely environmental terms of art such as "pollution", "seepage", "migration", "discharge", "dispersal", "release" and "escape" based upon ample judicial, contextual and regulatory precedent, which this Court should adopt.

In Porterfield v. Audubon Indemnity Co., 856 So.2d. 789 (Ala. 2002), the Supreme Court of Alabama held that in the specific context of the separation of particles of lead paint from the interior surfaces of a residential apartment, the terms "discharge", "dispersal", "release" or "escape" are reasonably susceptible to two or more constructions and there is reasonable doubt and confusion as to their meanings, especially since those words are terms of art that imply an active or clearly perceived physical event, especially when used together and ordinarily would be understood not to apply to the imperceptible chipping or flaking of lead paint which is attributed not to an act or physical event but rather to an involuntary effect occurring over a considerable period of years." *See also*, Regional Bank of Colorado v. St. Paul Fire & Marine Ins. Co., 35 F.3d 494 (10th Cir. 1994) (in spite of the insurer's urging that the carbon monoxide emissions in an apartment were not covered events as a result of the absolute pollution exclusion, the terms "irritant" and "contaminant" are not read in isolation but must be construed as substances generally recognized as coming from the environment and must occur in a setting substantially recognized as a toxic and particularly harmful substance by industry and government

regulators."); <u>Motorist Mut. Ins. Co. v. RFJ Inc. et al.</u>, 926 S.W.2d 679 (Ky. App. 1996) (the Court of Appeals of Kentucky found that the pollution exclusion was inapplicable in the case of a carbon monoxide leak in a dry cleaning business under a typical "Subsection f" pollution exclusion based upon consideration of the well documented historical perspective and the continued use of the environmental law terminology in framing the exclusion, therefore coverage was mandated.); <u>National Grange Mutual Ins. Co. v. Caraca</u>, 2006 Conn. Super. LEXIS 815 (Ct. 2006) (the absolute pollution exclusion is ambiguous as a matter of law and inapplicable to asbestos dust created by the sanding of floors and released into a home as one could conclude that the terms "discharge, dispersal, seepage, migration, release or escape" apply to outdoor environmental pollution only.); <u>Clendenin Bros. Inc. v. United States Fire Ins. Co.</u>, 290 Md. 449, 889, A.2d 387 (Md. 2006) (the Court of Appeals of Maryland found the absolute pollution exclusion ambiguous as drafted by the insurer and not intended to bar coverage where the insurer's alleged liability may be caused by non-environmental localized workplace fumes.)

In <u>Unisun Ins. Co. v. Schulwolf</u>, 53 Va. Cir. 220 (Norfolk Cir. Ct. 2000), the court held that claims arising from deteriorating lead-based paint do not fall within the pollution exclusion as it is reasonable to interpret such clause as applying to environmental pollution and the insurer's position was likewise reasonable, therefore deeming the clause ambiguous and mandating coverage.  In <u>Marshall v. Selective Ins. Co.</u>, 46 Va. Cir. 502 (Norfolk Cir. Ct. 1995) the Court held that the pollution exclusion was ambiguous and inapplicable to a loss that resulted from carbon monoxide fumes within a residential dwelling because the term "atmosphere" was susceptible to two or more meanings.

**D.      Reference to federal and Virginia authority regulating pollution provides relevant context to the exclusionary language and supports coverage for Mr. Edmonds' loss**

Reference to federal and Virginia legislation and regulations in the field of pollution provides important context to the words urged by BMIC to deny coverage, and supports Mr. Edmonds' "reasonableness" argument that coverage should be granted for his loss from Chinese drywall. The Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), for example, according to U.S.C. § 9601, *et seq.*, offers several relevant definitions that support an interpretation of the pollution exclusion as not applying to a compound originating in and remaining within the insured's residence. The term "environment" is defined to mean "the navigable waters, the waters of the contiguous zone, and the ocean waters ... or ambient air within the United States or under the jurisdiction of the United States." 42 U.S.C. § 9601 (8)(A) & (B). The term "release" means "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leeching, dumping, or disposing *into the environment*...." 42 U.S.C. § 9601 (22) (emphasis added). CERCLA defines the term "pollutant" or "contaminant" as any "element, substance, compound or mixture including disease causing agents, which after release *into the environment* and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring...." *See* 42 U.S.C. § 9601 (33) (emphasis added).

The compounds at issue are not classified as being particularly dangerous. In typical homes, they are at low levels and are likely activated by synergistic reactions with other conditions (heat and humidity) in the home. The Consumer Products Safety Commission noted

that the measured levels were such that a causal connection with health effects of any kind was uncertain. Mr. Edmonds' interpretation, backed by federal law, is therefore reasonable.

Inasmuch as the terms "discharge, dispersal, seepage, migration, release or escape" are terms that are featured prominently throughout CERCLA, this certainly gives significant context to Mr. Edmonds' argument that his interpretation of this provision as *not* excluding coverage for a circumstance occurring within his own home would be preeminently reasonable. Further the undeniable context of the subject exclusion is bared for all to see as any reasonable insured would look at the paragraphs 2(a) and (b) which speak absolutely to the fear of regulatory action that spawned the exclusion and establish its industrial context.

Sulfuric gases (undefined and unspecified) in a home in small amounts is not the dispositive question as BMIC argues in its Motion, since such gases and compounds do not impact the environment in the sense contemplated by a reasonable view of the term "pollutant" or "environment." They do not "seep", "migrate" or "release" in a manner contemplated by the exclusion as describing a pollution event. Contrary to the assertion of BMIC, the context of the urged pollution exclusion and the identity of terminologies that appear in federal anti-pollution legislation such as CERCLA are undeniable. They are not "pollutants" by any definition.

It is also noteworthy that CERCLA does not apply to releases "from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures." 42 U.S.C. §9604(a)(3)(B). <u>First United Methodist Church of Hyattsville v. U.S. Gypsum Co.</u>, 82 F.2d 862, 868 (4th Cir. 1969). The relevant Virginia definitions were referenced at page 14 of this memorandum and similarly seem to define pollution in traditional environmental terms.

**E.   Contrary to BMIC's arguments "pollution" and "pollutant" do not have a plain and ordinary meaning under the unique circumstances of the Chinese drywall loss and have no "common" or "plain" meaning in any context.**

BMIC cites West American Ins. Co. v. Johns Bros, 435 F. Supp. 2d 511 (E.D. Va. 2006) to suggest that "pollutant" has a common and plain meaning.   That case actually supports Mr. Edmonds' position.   In Johns Bros., the Court actually took notice of the extensive Virginia regulatory framework surrounding above ground and below ground petroleum storage tanks when concluding that the word "contaminant" would encompass the act of fuel oil leaking out of contained fuel lines into the soil. 435 F. Supp. 2d at 516.  The Court also considered statutes that clearly address contamination and utilized Va. Code Ann. § 58.1-3664.  The Court was following the guidance of the Supreme Court of Virginia in City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 628 S.E.2d 539 (2006), that indicates that examination of case law from other jurisdictions is "unnecessary…if the law of the Commonwealth and the plain meaning of the insurance policy provide the answer…" 435 F. Supp. 2d at 516.  Here resort to other sources is not only necessary, it establishes the absolute ambiguity of the undefined terms.  The General Assembly of Virginia did not define pollution to include air inside the home utilizing the term "outdoor atmosphere."   Virginia, through its General Assembly, would not have specifically defined air pollution as involving certain substances in the outdoor air unless it meant to define that the air inside the home cannot be the subject of "pollution." The term "pollution" and the use of the term "atmosphere" establishes that the General Assembly understood the term "pollution" in the industrial and environmental context that spawned the very word "pollution" in the modern era.

The identification of the terms "discharge", "dispersal", "seepage", "migration", "release" and "escape" as defined by dictionary definition in Firemen's Insurance Company of Washington, D.C. v. Kline & Sons Cement Repair, supra, also create ambiguities on the face of

the subject policy and in consideration of the context in which the terms are so utilized in the Total Pollution Exclusion.  Nowhere in the Edmonds Complaint is the mechanism of the creation of the compounds or their identity and the timeframe and circumstances under which they were created synergistically in the home set forth.  There are certainly many ways that these terms can be interpreted in the circumstance of gases occurring in the home as a result of chemical reactions with other components in the home.  Based on the well settled circumstances underlying the "Potentiality Rule", there are several circumstances set forth in the Complaint which would invoke coverage and further the ambiguities of the undefined terminologies in the policy create a duty to indemnify as well.

**F.  The Court should seek the guidance of the Supreme Court of Virginia by certifying specified issues which are ripe for determination by Virginia's highest court.**

Pursuant to Rule 5:42 of the Rules of the Supreme Court of Virginia, that Court may, in its discretion answer questions of law certified to it by United States District Courts.  Va. Sup. Ct. R. 5:42.  The Rule authorizes the Virginia Supreme Court to answer such questions on the conditions that a question of Virginia law is determinative in any proceeding pending before the certifying court, and it appears there is no controlling precedent on pointed decisions of the Supreme Court. *See* Rule 5:42.

The Virginia Supreme Court has never considered the question of the Total Pollution Exclusion in the context of a non-traditional environmental loss.  The Court has only considered the issue in the case of environmental pollution which had as its source the environment, and was itself a heavily federally controlled and defined contaminant. *See* City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., *supra*.  The application of the undefined terms "pollution" and "pollutants" in the subject policy coupled with the fact that the so-called

"pollution" originates within the confines of the home and is caused by a product used in the home creates a unique factual situation. Hundreds of Chinese drywall victims whose version of an American dream has devolved into a legal and procedural crossfire between foreign manufacturers avoiding the jurisdiction of United States courts, builders and suppliers with no apparent insurance who are teetering on bankruptcy, and insurance companies seeking to apply exclusions that were never designed for the type of loss presented by Chinese drywall, have advanced a reasonable interpretation of this exclusion. The ISO forms at issue are used nationally and in interstate commerce and are worded similarly throughout the United States. The fact that the high courts of numerous jurisdictions examining identical language have decisively concluded that the purpose of these exclusions removes their applicability in the context of in home or confined losses that don't define traditional pollution events should be considered by our Supreme Court. The holding of Nationwide v. Wenger, *supra*, should have no applicability in the face of ambiguous terms and predates the formulation and use of the very exclusions, both defined and undefined, that are at issue in these cases in response to federal and state regulatory guidelines and only came to fruition after the time that the Wenger case was decided. The complexities of "pollution" and "pollutant" do not lend themselves to simple "plain meaning" analysis and demand thorough extrinsic examination to divine contractual intent. It is the respectful position of Edmonds that mere perusal of applicable environmental statutes and dictionary definitions indicate that the intent of the insurer in this case was to protect itself from environmental cleanup costs from a definable pollution event. For BMIC to suggest that what's happening in the Edmonds' home constitutes a pollution event or involves a "pollutant" would lead to an unjust and unreasonable result. *See* Granite State Ins. Co. v.

Bottoms, *supra*.   Certification of this issue would create a definitive answer for hundreds of

Virginia homeowners.

The Fourth Circuit United States Court of Appeals has been asked to certify certain issues

to the Virginia Supreme Court in connection with the appeal of the District Court's decision in

Travco Ins. Co. v. Ward, No. 2:10cv14, 2010 U.S. Dist. LEXIS 54387 (E.D. Va. June 3, 2010).

It is respectfully requested that this Court certify the following issues for determination by the

Virginia Supreme Court:

1. In the subject policy of insurance, is the Total Pollution Exclusion ambiguous in the
   specific context of compounds being present in a residential home as the result of the
   characteristics of a product used as a building material in such home?

2. Are the interpretations of similar defined and undefined terms in identical pollution
   exclusions by the high courts of other states as well as United States District Courts
   evidence of a "reasonable" interpretation of such terms by an insured in Virginia?

3. Is the application of the Total Pollution Exclusion unreasonable in the context of
   losses in a residential home in light of its history and is it in conflict with federal and
   state statutes which do not define exposure within businesses or residential dwellings
   as a pollution event?

**G.    The "your work" exclusion is not amenable to disposition upon summary
judgment and is framed in the policy in such a way so as to invoke the "Potentiality
Rule"**

Virginia law is clear and well settled that the duty to defend is broader than the obligation

to pay.  Brenner v. Lawyers Title Ins. Co., 240 Va. 185, 397 S.E.2d 100, 102 (1990), in that an

insurer's duty to defend is triggered if there is any possibility that a judgment against the insured

will be covered under the insurance policy. Bohreer v. Erie Ins. Group, 475 F.2d 578, 584 (E.D.

Va. 2007).  The construction and presentation of the so-called "your work" exclusion in the

subject policy of insurance creates several issues of fact and the applicability of the exclusion

certainly cannot be determined by simple examination of the complaint itself.

BMIC relies upon the "your work" exclusion contained in endorsement BCG 22 94 11 03. The subject endorsement excludes property damage to "your work" arising out of it or any part of it and included in the "products-completed operations hazard." The Policy defines "products-completed operations hazard" as follows:

> **11.a**  **"Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:**
>
> > (1)  Products that are still in your physical possession; or
> >
> > (2)  Work that has not yet been completed or abandoned.
>
> **c.**  **This hazard does not include "bodily injury" or "property damage" arising out of:**
>
> > (1)  The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;
> >
> > (2)  The existence of tools, uninstalled equipment or abandoned or unused materials;
> >
> > (3)  **Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations.**

The subject definition at 11(a), when read in connection with 11(c)(3) sets forth that the products-completed operations hazard does not include "bodily injury" or "property damage" arising out "products or operations for which the classification in this Coverage Part or in our Manual of Rules includes products or completed operations." Other resort to the policy as a whole indicates in Document 1-1 at page 4 of 67 that in the subject policy at three places, namely "Contractors Permanent Yards-Maintenance or Storage of Equipment" and "Contractors-Executive Supervisors or Executive Superintendents" these include <u>products and completed operations</u> as being subject to the general aggregate limit. In addition, next to the term "Contractor/Subcontractor Work" there contains the "P" designation, denoting "products-

completed operations" besides the subject description. On its face, BCG 22 94 11 03 does not even apply to the underlying claims, and these matters are certainly not amenable to disposition pursuant to the "eight corners" rule. Given the need for extrinsic evidence and the development of a factual record, the instant motion cannot be resolved. It is also respectfully suggested that the issue of indemnity should be resolved in the context of the underlying controversy between Edmonds and his builder. <u>Fuisz</u>, *supra*.

## CONCLUSION

The Court should overrule the Plaintiff's Motion for Summary Judgment and hold that there is a duty to defend and indemnify BMIC's insured.

**RICKY L. EDMONDS**

By:_____/s/_____
                    Of Counsel

Michael F. Imprevento, Esquire (VSB No. 23926)
John W. Drescher, Esquire (VSB No. 13656)
Jeffrey A. Breit, Esquire (VSB No. 18876)
Breit, Drescher, Imprevento & Walker, P.C.
1000 Dominion Tower
999 Waterside Drive
Norfolk, VA 23510
Phone: 757-670-3884
Fax: 757-299-8035 Facsimile
mimprevento@breitdrescher.com
*Co-counsel for Defendant Ricky L. Edmonds*

Richard J. Serpe, Equire
The Law Offices of Richard J Serpe, P.C.
Crown Center, Suite 310
580 East Main Street
Norfolk, Virginia 23510
Phone: 757-233-0009

Fax:  757-233-0455
rserpe@serpefirm.com
*Counsel for Defendant Ricky L. Edmonds*

Fred S. Longer, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
flonger@lfsblaw.com
*Counsel for Defendant Ricky L. Edmonds*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of November, 2010, I will electronically file the foregoing Defendant Ricky L. Edmonds' Brief in Opposition to Plaintiff's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to:

Danny M. Howell, Esquire
Michael T. Marr, Esquire
Mikhael D. Charnoff, Esquire
Courtney S. Schorr, Esquire
Sands Anderson P.C.
1497 Chain Bridge Road, Suite 202
McLean, Virginia 22101
Tel.: (703) 893-3600
Fax: (703) 893-8484
dhowell@sandsanderson.com
mmarr@sandsanderson.com
mcharnoff@sandsanderson.com
cschorr@sandsanderson.com
*Counsel for Plaintiff*

Andrew Biondi, Esquire
Sands Anderson, P.C.
1111 East Main Street, 24th Floor
P.O. Box 1998
Richmond, Virginia 23218
Tel: (804) 783-7270
Fax: (804) 783-7291
abiondi@sandsanderson.com
*Co-counsel for Plaintiff*

Jeffrey H. Geiger, Esquire

Sands Anderson PC
1111 East Main Street, 24th Floor
P.O. Box 1998
Richmond, Virginia 23218-1998
Tel: (804) 783-7248
Fax: (804) 783-7291
jgeiger@sandsanderson.com
*Counsel for Plaintiff*

Richard G. Collins, Esquire
Bartlett & Spirn, P.L.C.
809 Richmond Road
Williamsburg, Virginia 23185
Tel: (757) 229-1910
Fax: (757) 229-7323
rcollins@bartlettspirn.com
*Counsel for Defendant Parallel Design & Development LLC*

                                              _____/s/_____
Michael F. Imprevento, Esquire (VSB No. 23926)
Breit, Drescher, Imprevento & Walker, P.C.
1000 Dominion Tower
999 Waterside Drive
Norfolk, VA 23510
Phone: 757-670-3884
Fax: 757-299-8035
mimprevento@breitdrescher.com
*Counsel for Defendant Ricky L. Edmonds*